**GENERAL ELECTRIC COMPANY,**
**Plaintiff,**

v.

**VALERON CORPORATION, Defendant.**

**Civ. A. No. 5–71257.**

United States District Court,
E. D. Michigan, S. D.

Feb. 1, 1977.

Chester L. Davis, Jr., Barnes, Kisselle, Raisch & Choate, Detroit, Mich., for plaintiff.

Bernard J. Cantor, Cullen, Settle, Sloman & Cantor, P. C., Ivan E. Barris, Barris & Crehan, P. C., Detroit, Mich., for defendant.

## OPINION ON MOTION TO DISQUALIFY

FEIKENS, District Judge.

General Electric sues Valeron claiming infringement of its United States Patent No. 3,341,920 and has now moved for an order to disqualify Bernard J. Cantor and the firm of Cullen, Settle, Sloman & Cantor, P. C., as attorneys for Valeron Corporation, defendant herein.

General Electric Company is organized and exists under the laws of New York and Valeron Corporation is organized and exists under the laws of Michigan. The suit arises under the patent laws of the United States.

In its complaint General Electric charges that Valeron infringed G.E. Patent No. 3,341,920 (the Kelm Patent) by making, selling and actively inducing others to use cutting tools embodying the invention in that patent. Valeron denies infringement and seeks a declaration of invalidity because of specified prior art and prior invention.

Valeron says that the Kelm Patent ('920) is invalid because of an alleged prior invention disclosed in U.S. Patent No. 3,310,859 which is now owned by Valeron.

In making these findings regarding the Kelm Patent or any other patent the Court notes that these findings are made for the purpose of ruling on plaintiff's motion only.

The Kelm Patent in suit is applicable in the cutting tool field. It applies specifically to a cutting insert retained in a pocket on a cutter tool body by a locking pin that fits in a hole in the insert and is threaded into a hole in the cutter body. As the pin is tightened a conical portion on the pin engages an offset conical portion of the hole in the body. This causes the pin to move in a direction which locks the insert against a shoulder of the recess or pocket in the cutter body.

U.S. Patent No. 3,310,859, herein known as the Diemond Patent, also is applicable in the cutting tool field. It applies specifically to a cutting insert retained in a recess on a cutter tool body by a locking pin having a head that fits in a hole in the insert and a shank which is threaded into a hole in the cutter body. As the pin is tightened a conical portion on the head of the pin engages an off-set conical portion of the hole in the body which causes the pin to move in a direction which locks the insert against a shoulder of the recess or pocket in the cutter body. In these proceedings this has been referred to as the Valeron lock screw mechanism. The Kelm locking mechanism ('920) is used by plaintiff in its single-point cutting tools, boring bars and milling cutters. The Valeron lock-screw mechanism ('859) is used in its single-point cutting tools, boring bars and milling cutters. Plaintiff and defendant are competitors in the cutting tool field.

Shortly after this case was commenced Bernard Cantor entered his appearance as trial counsel for Valeron. What gives rise to the controversy is that Cantor was an attorney for plaintiff in 1965–1967. He prepared several draft patent applications for General Electric including subject matter which plaintiff claims is substantially related to the subject matter in this case.

When plaintiff filed its motion the Court determined that an evidentiary hearing was necessary in order to rule. The following facts appeared.

Cantor's contacts as an attorney for plaintiff in 1965 through 1967 were with the Carboloy Department of plaintiff. He dealt primarily with Harold J. Holt, in-house patent counsel for the Carboloy Department. In preparing some eleven patent applications for plaintiff, Cantor met with Holt and received disclosures of inventions (including samples, drawings and written disclosures by the inventors), had conferences with them, reviewed drafts with them, obtained knowledge of plaintiff's cutting tools and exercised professional judgment by reviewing related applications and by drafting claims to avoid interference problems, known prior art and division and restriction requirements.

It appeared that in the period 1965–1967 William Reich, Manager of Engineering at Carboloy, Elbert J. Weller, Manager of a Metal Working and Mining Products Engineering Section, and tool designers Walter Kelm, Tom Gowanlock, Tom Kordowski, Norman Campbell, Floyd Kirkham and Arnold Bower all worked together for plaintiff. They discussed, advised and cooperated with each other in connection with the projects of the cutting tool group and had access to each other's ideas, notebooks and disclosures. It was in this period that the Kelm locking mechanism was invented by Walker Kelm. Work was also done on an insert utilizing the Kelm locking mechanism by Weller and Kelm, an adjustable boring bar by Kelm, and a disposable insert milling cutter by Campbell and Weller.

Holt, with whom Cantor worked,* prepared and prosecuted patent applications which matured into the Kelm Patent in suit as well as the Weller-Kelm '921 Patent and the Kelm '923 Patent. During this period it appeared that when plaintiff's Carboloy di-

---

* Although Cantor did no work in the Kelm '920 application,

vision prepared a patent application this was usually begun with an invention disclosure letter; then in turn engineering prints, drawings, invention questionnaires, supplemental disclosure letters, relevant prior art, novelty search results, interpretation of prior art, patentability opinions and comments on questions of infringement became a part of the application file. Other data also was included, and of significance in this connection is the fact that Holt maintained invention records. The information in these patent application files was not publicly disseminated.

In connection with the patent applications on which Cantor worked, Holt and Cantor worked closely and Holt disclosed to Cantor all of the documents and information necessary to complete as final an application draft as could be done. To carry out his work as an attorney in connection with these eleven applications Cantor had numerous conferences at the Carboloy Plant with Holt and the inventors. Holt's files were available to Cantor. He received confidential disclosures and engineering drawings, and he had access to plaintiff's patents, patent collections and prior art collections on fitting and pocketing inserts in tools. He likewise had access to plaintiff's pending applications. He rendered advice. He suggested strategy on how to obtain claim protection, and he made recommendations on how to proceed with patent applications.

Among the patent applications on which he worked was the Campbell-Weller milling cutter application, the Kelm '401 boring bar and the Kirkham U.S. Patent No. 3,368,265. These were inventions in the cutting tool area. He also did work on mining drills and in areas other than this.

The Court notes that Cantor began his professional relationship with plaintiff after the Kelm '920 Patent had been filed. While Cantor did not prepare this application, plaintiff contends that Cantor had full opportunity to acquire information, confidences and secrets and form his own opinions regarding the Kelm '920 Patent while he was plaintiff's attorney.

It is significant that Cantor prepared the Kirkham '265 Patent, for it relates to a machine for operating cam pin-locking mechanisms to automatically release, index and secure an insert in a cutting tool holder. The cam pin-locking mechanisms are claimed in plaintiff's Hill Patent which defendant says in its answer is prior art which invalidates the Kelm '920 Patent.

Cantor had access to Kirkham. He received a witnessed written invention disclosure signed by Kirkham and viewed the machine for cam pin-locking mechanisms on two occasions for a total of four hours.

Cantor also worked closely with Kelm in the preparation of the Kelm '401 Patent. He also met Kelm's associates, and in connection with this work Cantor made notes, hand sketches and reviewed drawings. The Kelm adjustable boring bar contains the Kelm locking mechanism insert. In studying the boring bar for the purpose of making a patent application Cantor had access to the locking mechanism of the Kelm '920 Patent.

Cantor also worked on the Campbell-Weller milling cutter invention, a milling cutting body having a plurality of pockets, each with an indexable insert and an underlying seat retained therein by the locking mechanism of the Kelm Patent in suit. Here, again, Cantor met with Holt, and again he had access to Weller, Campbell, and the drawings and documents necessary to complete this application. Plaintiff's Exhibit 61 shows that Cantor's drawing for the Campbell-Weller milling cutter application is strikingly similar to Fig. 2 of the drawing in the patent application for the Kelm Patent in suit. This same exhibit shows that in the Cantor draft description it was stated that "such releasable locking means . . . are disclosed in . . . the patent application of Walter Kelm (Kelm '920 Patent in suit). . . ." Plaintiff's Exhibit 46 referred to the similarity between Fig. 2 of the drawings in the Kelm Patent '920 and Fig. 5, which is Cantor's drawing in the Campbell-Weller milling cutter application. Figs. 5 and 6 in Plaintiff's Exhibit 13AA, which are rough

drawings made by Cantor, show a protrusion of the pin which is shown only in the Kelm '920, Weller and Campbell '921 and Kelm '923 Patents. Cantor, in testifying to this, said that he obviously copied it off something. Again, this indicates the access that he had to the drawings and concepts of the patent in suit. Cantor acknowledged that he would normally refer to a pending application when incorporating it by reference in the disclosure of the patent application on which he was working. He acknowledged that the Campbell-Weller application incorporates the entire disclosure of the then Kelm application for the '920 Patent.

Thus, when one considers the inventor's disclosure letter, Plaintiff's Exhibit 13DD, and attached prints, Plaintiff's Exhibit 43A through H, which characterize utilization of the Kelm locking mechanism as a unique feature, Cantor's own application draft and drawings which describe and incorporate by reference the locking mechanism of the Kelm Patent in suit, and the rejection of the Campbell-Weller application by the Patent Office examiner, it must be concluded, and the Court so finds, that there is a substantial relationship between the subject matter of Cantor's work on the Campbell-Weller application and the Kelm '920 Patent. The locking mechanism Cantor disclosed in his application is the locking mechanism of the Kelm '920 Patent. The inferences which flow from Cantor's activity in this regard are so strong that it would be unreasonable to conclude that Cantor did not have some knowledge of the Kelm '920 application.

While plaintiff introduced other evidence which it claims establishes the substantial relationship between the Diemond Patent and the patent in suit, particularly that of the Patent Office activity, the Court will make no findings in that regard since such questions may well go to merits of the suit itself. It is sufficient to say that the contentions of the parties in this regard, the answer filed by defendant and the matters that have sought to be and have been investigated in discovery to date all tend to show a substantial relationship between the matters on which Cantor worked while he was an attorney for General Electric and the subject matter of this suit.

■ Based on these findings the Court concludes that Cantor, while a patent attorney for plaintiff, exercised professional judgment in the course of his representation of plaintiff, that the subject matter in his representation of plaintiff and his present representation of defendant is close, and that he had access to confidential information and opportunity to examine this information. Accordingly, the opinions, views and professional judgment which he now has might and in all likelihood were formed in good measure as the result of that prior relationship he had with plaintiff. Thus the Court concludes that even if Cantor did not obtain any confidential information, and even if one were to say that no part of his present professional opinions or judgments is based on his activity on behalf of plaintiff while he was its attorney, there is, nonetheless, the appearance of impropriety. That appearance of impropriety exists now because Cantor represents an interest adverse to that of General Electric on subject matters which are substantially related and identical.

■ In considering the matter of disqualification of an attorney, courts have used the substantial relationship test as a standard. In *Consolidated Theatres v. Warner Brothers,* 216 F.2d 920, 924 (2d Cir. 1954), it was held that to prove the existence of a professional obligation "the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are *substantially related* to the matters or cause of action wherein the attorney previously represented him, the former client." (Emphasis added)

In that case the Court of Appeals for the Second Circuit referred to a district court case, namely, *T. C. Theatre Corporation v. Warner Brothers,* D.C.N.Y., 113 F.Supp. 265, at 269, in which Federal Judge Weinfeld held that:

In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney might have acquired information *related* to the subject of his subsequent representation. If so, then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of Canon 6. (Emphasis added)

In an early case in this Circuit the U.S. Court of Appeals for the 6th Circuit said in *United States v. Bishop,* 90 F.2d 65, 66 (6th Cir. 1937), quote:

It is well settled that an attorney who has acted for one party cannot render professional services in the *same* matters to the other party, and it makes no difference in this respect whether the relationship itself has terminated, for the obligation of fidelity still continues. (Emphasis added)

In the case of *Cannon v. U. S. Acoustics Corporation,* 398 F.Supp. 209 (Northern District, Illinois, 1975), Judge Marshall dealt at length with this subject. That Court pointed out that the common law principles of disqualification are embodied in the Code of Professional Responsibility. He noted that Canon 4 states that "a Lawyer Should Preserve the Confidences and Secrets of a Client." Judge Marshall then undertook an analysis of the underlying ethical considerations. He found that for the relationship of attorney and client to be of maximum benefit to the client, a total disclosure by the client to the attorney is required. It was a necessary corollary to this concept that the lawyer would then preserve any confidences and secrets transmitted to him. Only upon the lawyer's having obtained all possible information from his client could the lawyer make the necessary professional judgment as to what was relevant and important and what was irrelevant and unimportant and that consequently the lawyer receiving the confidences and secrets of his client could not use such information to the client's disadvantage. He pointed out that Canon 9 of the Code of Professional Responsibility provides that "a Lawyer Should

Avoid Even the Appearance of Professional Impropriety." It is noted that the United States Court of Appeals for the 7th Circuit held in the case of *Dr. Schloetter et al v. Railoc of Indiana, Inc.,* 7th Cir., 546 F.2d 706 at page 709, "Read together, the two canons indicate that an attorney *may* be required to withdraw from a case where there exists even an appearance of a conflict of interest." Judge Marshall concluded that a former client need show no more than that the matters embraced within the pending suit, wherein his former attorney appears on behalf of his adversary, are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client.

In similar vein Judge Weinfeld's opinion in *T. C. Theatre Corporation v. Warner Brothers, supra,* at page 268, 269 is illuminating:

The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained. . . . In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of his subsequent representation. If so, then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of Canon 6.

Or again, Judge Marshall: (*Cannon, supra,* page 223):

In essence the court was saying it would order disqualification if the matters in the two engagements were substantially related. This is determined by asking whether it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation. Importantly, the

court did not require the movant to prove that confidences and secrets were reposed. That fact is assumed once a substantial relationship is established.

In *American Roller Company v. Budinger,* 513 F.2d 982, 986 (3rd Cir. 1975), the Court held that:

It is the possibility that confidences might be breached and not the fact of their disclosure *or use* that dictates disqualification once a substantial relationship between two representations has been established. (Emphasis added)

■ Defendant also argues that in any event all information obtained from General Electric by Cantor has been published or is available from non-confidential sources. This was treated in *Emle Industries, Inc., v. Patentex, Inc.,* 478 F.2d 562, 572–573 (2nd Cir. 1973), and the Court held that this argument was of no avail. The Court stated:

. . . the client's privilege in confidential information disclosed to his attorney "is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources." (Quoting H. Drinker, Legal Ethics 135 (1953)).

■ From these cases the following principles emerge:

1. If there is a *substantial relationship* or a *sufficiently close relationship* between the matters on which the attorney worked in his prior retainer and the matters in which he has worked on his subsequent retainer, this is all that the former client need show.

2. This *substantial relationship* or *sufficiently close relationship* test is compelled by the nature of the relationship of attorney and client.

3. All confidences and information of the client are to be protected.

4. The ethical considerations which support this concept require that a lawyer should preserve the confidences and secrets of his client and that a lawyer should always avoid even the appearance of professional impropriety in so doing.

5. Because of these considerations a lawyer should be disqualified in a representation in which he may have had access or opportunity to obtain confidential material, and the client need show no more than this in order to be protected.

The local rules of this Court adopt the Code of Professional Responsibility and these Canons by reference. These considerations and the Canons apply fully to attorneys practicing in this court.

■ Finally this Court notes that even if it were forced to conclude that it had doubt that an attorney received any confidential information that doubt should be resolved in favor of attorney disqualification. In *Hull v. Celanese Corporation,* 513 F.2d 568, 571 (2d Cir. 1975), the Court faced an argument that in-house counsel for Celanese had switched sides to become a plaintiff (rather than a lawyer) on the other side. Defendant then sought to disqualify the Rabinowitz firm, who represented this plaintiff, and it was argued that they had advised this plaintiff and former attorney for Celanese, one Delulio, not to reveal any information to them received in confidence by plaintiff as an attorney for Celanese. While the Court credited the Rabinowitz firm for this attempt to avoid the receipt of any confidences, it held that the receipt of confidential information itself did not have to be shown, only that the attorney might have acquired information, and that if there was doubt as to this it should be resolved against the attorney.

What finally must be said is that Canon 9 of the Code of Professional Responsibility makes it obligatory that a lawyer should avoid even the appearance of professional impropriety. In our society lawyers have been granted significant privileges. It is in their interests, as well as in the preservation of the adversary system, that there be scrupulous adherence to proper dealing. It

makes no difference that the clients involved in this litigation are experienced and sophisticated corporations.

Consequently, the Court concludes that Bernard Cantor must be disqualified in his representation of the defendant in this case. In order to make it clear that the appearance of impropriety cannot be countenanced, the Court reluctantly concludes that Cantor's firm should likewise be disqualified.

An appropriate Order may be submitted.