681 So.2d 29 (1996)
Joan Hebert, Wife of/and Michael HEBERT, Sr.
v.
E. James ANDERSON, Carmen Posada-Pepper, et al.
No. 96-C-0994.
Court of Appeal of Louisiana, Fourth Circuit.
September 18, 1996.
Writ Denied December 6, 1996.
*30 Daniel J. Mackel, Jr., New Orleans, for Plaintiffs/Applicants, Joan Hebert, Wife of/and Michael Hebert, Sr.
Stewart E. Niles, Jr., Michelle A. Bourque, Patricia A. Bethancourt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, for Defendants/Respondents, E. James Anderson, M.D. and Louisiana Medical Mutual Insurance Company.
Stephen M. Pizzo, Blue Williams, L.L.P., Metairie, for Defendants/Respondents, Carmen Posada-Pepper, M.D., Vimala A. Mascarenhas, M.D., and Louisiana Medical Mutual Insurance Company.
Before LOBRANO, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
We grant certiorari in this matter to review a discovery order issued by the trial court in this medical malpractice case. All parties have thoroughly briefed the issues presented for our review. Because of the unique circumstances that led to the trial court's order, we find that pre-trial review by this court is warranted since failure to do so would result in irreparable harm.[1]
Plaintiffs filed this medical malpractice suit after their two year-old-son, Michael, died from a brain tumor, which they allege was wrongly diagnosed. Defendants, three pediatricians who practice together, each treated Michael at some point before his death. During discovery, plaintiffs requested all of the defendant doctors' office records on Michael. Counsel for Drs. Posada-Pepper and Mascarenhas complied with the discovery request. In doing so he inadvertently included in the medical records that were produced a letter written to all of the defendant doctors by their former attorney. This letter was a recounting of a conversation that the attorney and his associate had with Dr. Jonell McAllister, the pediatric neurologist who treated Michael Hebert at East Jefferson General Hospital.
The parties disagree as to what occurred after the medical records were produced. Mr. Mackel, plaintiffs' counsel, alleges that he received the office records on November 1, 1995, and reviewed the records on that date while preparing a request for admission of their authenticity. During this review he discovered the letter addressed to the three defendant doctors. He received a call from a paralegal for Stephen Pizzo, new counsel for Drs. Posada-Pepper and Mascarenhas, on November 9, 1995. Mr. Mackel alleges that the paralegal asked about a "report" of Dr. Jonell McAllister, which the paralegal advised inadvertently had been included in the office records that were produced on November 1. Mr. Mackel denied receiving such a report. He contends that he was called by Mr. Pizzo later that day and that he explained to Mr. Pizzo that he had again reviewed the records after the paralegal's call. He told Mr. Pizzo that he had found no report from Dr. McAllister. He advised, however, that he had found a letter recounting a meeting between Dr. McAllister and defendants' former counsel.
*31 Mr. Pizzo's recollection of the events is somewhat different.[2] He claims that his paralegal telephoned Mr. Mackel who advised that he had not reviewed the records. Mr. Pizzo alleges that he personally called Mr. Mackel later that afternoon. He contends that Mr. Mackel advised that the records had not been reviewed. Mr. Pizzo asked Mr. Mackel to allow his paralegal to retrieve the letter from the records. Mr. Mackel refused this request, claiming he was too busy at that time. Mr. Pizzo telephoned Mr. Mackel again later that same day in order to arrange a time to recover the letter. At that time Mr. Mackel advised that he had found and read the letter a week earlier.
Mr. Mackel alleges that Mr. Pizzo agreed that the information in the letter was discoverable. He contends that he offered to return the letter to defendants, and to make no mention of the letter during further discovery or at trial. Defendants' counsel, however, insisted that plaintiffs' counsel also agree not to discuss with any of plaintiffs' experts any of the "theories" advanced by Dr. McAllister as discussed in the letter. Mr. Mackel refused to enter into the additional stipulation.
Defendants filed a motion in limine and motion for return of privileged documents and/or protective order praying that the letter be returned and that plaintiffs be prohibited from eliciting during discovery or at trial the "theories" contained in the letter. Defendants argued that counsel's letter to his clients was protected by the attorney-client privilege and the attorney work product privilege. Following a hearing on April 9, 1996, the trial court issued an order directing plaintiffs' counsel to destroy the letter and all copies and to certify to the court that this had been done. The order also prohibited plaintiffs' counsel from eliciting any of the following opinions at trial from Dr. Joseph Abram and Dr. John Menkes, plaintiffs' experts:
1. That Michael Hebert, Jr., was diagnosed as dehydrated, but that electrolytes do not indicate dehydration;
2. That Michael Hebert, Jr.'s, decreased mental status on the second day of hospitalization could not be explained as a result of the use of Phenagran (sic) suppository, which he had received prior to the hospitalization;
3. That Michael Hebert, Jr.'s blood pressure increased while he was hospitalized at East Jefferson Hospital and was abnormal, and should have been a concern to the attending physicians;
4. That the amount of fluid Michael Hebert, Jr., received was excessive and that he was not dehydrated, and that this amount of fluid may have accelerated his demise, or caused a hydrocephalus which may have led to his death;
5. That the urine specific gravity does not reflect dehydration, however, the high finding on the urine specific gravity might not have been an error, especially in light of the electrolytes;
6. That mothers often know when something is going wrong with their child, and Dr. Anderson perhaps should have listened to her complaints and acted upon them.
Violation of the order would result in mistrial, with the offending party to pay all trial costs. The order allowed plaintiffs to retain other experts to testify at trial, provided they make them available for deposition prior to trial. If plaintiffs did retain new experts the "poison" letter could not be provided to or discussed with them, none of the "issues" in the letter could be revealed to them, and defendants' counsel would be entitled to question the experts as to whether the contents of the letter had been disclosed to them. Plaintiffs applied for supervisory writs to review the trial court's ruling.

DISCUSSION:
The letter from counsel to the doctors is subject to the attorney-client privilege. It was prepared by defendants' counsel and directed to the defendants. The *32 inadvertent disclosure of this communication by defendants' counsel does not constitute a waiver of that privilege. Succession of Smith v. Kavanaugh, Pierson & Talley, 513 So.2d 1138 (La.1987) (the client is the holder of the privilege, and only he or his attorney or agent acting with his authority, can waive it). This letter is also subject to the attorney work product privilege. La.Code Civ. Proc. Ann. art. 1424 instructs what a court can and cannot order a party to produce in the course of discovery. Article 1424 provides that "[t]he court shall not order the production or inspection of any part of the writing that reflects the mental impressions, conclusions, opinions, or theories of an attorney or expert." Therefore, the trial court did not err when it ordered that this letter, which inadvertently came into plaintiffs' counsel's hands, and all copies of it be destroyed.
It does not follow, however, that the plaintiffs should be restricted in eliciting testimony from their experts or Dr. McAllister. The order issued by the trial court precludes plaintiffs from eliciting from their current experts any of the opinions that are recounted in the letter as attributed to Dr. McAllister. We note that the letter in question does not contain defense counsel's impressions, conclusions, opinions or theories. It recounts Dr. McAllister's impression, conclusions, opinions and theories as to the care rendered to Michael as well as Dr. McAllister's observations regarding potential problem areas in Michael's treatment.
Dr. McAllister is not an expert retained by defendants. She is one of Michael Hebert's treating physicians. Either party has the right to question her regarding her impressions and opinions related to Michael's treatment prior to her being involved in Michael's treatment. Accordingly, plaintiffs' counsel is entitled to discover directly from Dr. McAllister her theories, opinions and impressions, as well as all other non-privileged matters. Weidenbacher v. St. Paul Fire & Marine Ins. Co., 347 So.2d 1160, 1161 (La. 1977). She may be questioned about Michael's treatment prior to and during his admission to East Jefferson Hospital. She may be asked questions about any of the medical records, including the defendants' office records. Counsel for either side may use those records to formulate questions to ask Dr. McAllister as well as other experts.
The trial court limited the plaintiffs' ability to develop their case because plaintiffs' counsel, through no fault of his own, acquired the letter in question. The defendants argue that the trial court's actions in this regard are supported by two opinions of the ABA Committee on Ethics and Professional Responsibility (Formal Opinion 92-368 and 94-3820), concerning inadvertent disclosure of privileged correspondence. In the former opinion, the committee refers to materials that "on their face" appear to be privileged. The latter opinion warns that attorneys who review inadvertently received materials could be disqualified from representing the client. The response to plaintiffs' discovery request consisted of the defendants' office records. Based on all the circumstances we cannot say that plaintiffs' counsel should have known immediately that the letter was attorney work product or a privileged communication.
The trial court apparently did not consider plaintiffs' evidence that they had prior knowledge by independent sources of the same opinions and concerns attributed to Dr. McAllister. However, review of this evidence convinces this court that the plaintiffs have provided sufficient proof that they had identified theories and areas of concern similar to those attributed to Dr. McAllister in the defense attorney's letter through consultations with their own experts prior to the inadvertent disclosure of Dr. McAllister's opinions.
Counsel's letter reflects that Dr. McAllister questioned the diagnosis of dehydration because the electrolytes did not indicate dehydration. She also opined that "the amount of fluid Michael received was excessive in light of the electrolyte panel, and that the amount of fluid may have `pushed him over the edge' as to the hydrocephalus." Lastly, she pointed out that the urine specific gravity did not reflect dehydration, but it was possible that the high finding on the urine specific gravity might have been an error, especially in light of the electrolytes.
The April 1, 1994 report of plaintiffs' consultant questions the rate of IV administration *33 of fluids for a child of Michael's size, and the diagnosis of dehydration based on the child's physical appearance. The consultant reported that she planned to research "fluid and electrolytes more extensively to obtain information about the implications of too much fluid and how it might have impacted on the outcome." She requested legible copies of lab reports and intake and output records. This initial opinion of plaintiffs' consultant clearly tracks the same findings as those noted by Dr. McAllister, although not as thoroughly. Additionally, the request for more lab reports and the indication that more research would be done illustrates the problems on which the consultant was focusing. These were the problems Dr. McAllister supposedly noted.
In her letter dated May 21, 1994, plaintiffs' consultant again questions the rate of administration of fluids. She also noted that the child's blood pressure was abnormally high and should have triggered suspicion of intracranial pressure. Finally, it was noted that the child's mother was greatly distressed because of Michael's worsening condition. The defense attorney's letter states that Dr. McAllister believed that the child's rising blood pressure should have caused some alarm for the attending physicians. In addition, Dr. McAllister purportedly noted that Michael's mother was angry with Dr. Anderson when he refused to give credence to her worries. Again, it appears that the problems in treatment highlighted in the consultant's second letter closely track those noted by Dr. McAllister. In fact, the only area of concern not addressed by the plaintiffs' initial consultant is the child's mental status on his second day of hospitalization. Dr. McAllister supposedly opined that Michael's decreased mental status at that point could not be attributed to Phenergan suppositories given before he entered the hospital.
This area of concern, however, was addressed by Dr. Abram, an expert retained by plaintiffs before the disclosure of the letter. In his deposition taken in July of 1995, months before the letter was disclosed to plaintiffs' counsel, he stated his concerns about the continued use of Phenergan without a physical examination.
Accordingly, we find that plaintiffs cannot cross examine Dr. McAllister with the letter nor use it to impeach her. Plaintiffs, however, are not otherwise restricted in deposing Dr. McAllister. Likewise, plaintiffs should not be forced to hire additional experts to advance those opinions.
We, therefore, affirm the trial court's order insofar as it requires plaintiffs to destroy the original and all copies of the letter, and to certify to the trial court that this has been done. In all other respects, the order of April 9, 1996, is reversed and set aside.[3]
WRIT OF CERTIORARI GRANTED; JUDGMENT AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] Normally we would decline to address pre-trial discovery issues, advising the parties of their remedy on appeal.
[2] Mr. Stewart Niles, new counsel for Dr. Anderson, was not directly involved in the events of November 5, 1995, and has no personal knowledge of them. He apparently has adopted Mr. Pizzo's version of those events.
[3] The trial court's Order stated that the court found that there was "good cause to grant the Motion [for Return of Privileged Documents and/or for Protective Order]." We cannot tell if the court found that plaintiffs' counsel acted inappropriately by failing to immediately advise defense counsel that he had the letter and returning same. Our reversal of the portion of the judgment that restricted the plaintiffs' presentation of their case does not preclude the trial court from imposing an appropriate sanction if, in fact, it determines that plaintiffs' counsel was guilty of misconduct.