**UNITED STATES of America**

v.

**Edwin EDWARDS, et al.**

**No. Crim.A. 98–165–B–M2.**

United States District Court,
M.D. Louisiana.

Feb. 25, 1999.

Michael S. Fawer, Covington, LA, Edwin Edwards, Baton Rouge, LA, for Edwin Edwards, defendant.

Karl J. Koch, Unglesby & Koch, Baton Rouge, LA, Lewis O. Unglesby, Lewis O. Unglesby, Attorney at Law, Baton Rouge, LA, Stephen Edwards, Baton Rouge, LA, James M. Cole, Bryan Cave LLP, Washington, DC, for Stephen Edwards, defendant.

Rebecca L. Hudsmith, Lafayette, LA, for Cecil Brown, for defendant.

Servando C. Garcia, III, Garcia & Bishop, Metairie, LA, for Andrew Martin, defendant.

Patrick Fanning, New Orleans, LA, for Bobby Johnson, defendant.

Mary Olive Pierson, Cooper & Pierson, Baton Rouge, LA, Camille F. Gravel, Jr., Alexandria, LA, James Michael Small,

Law Offices of J. Michael Small, Alexandria, LA, Hillar C. Moore, III, Baton Rouge, LA, for Gregory Tarver, defendant.

## RULING ON GOVERNMENT'S MOTION AND INCORPORATED MEMORANDUM OF LAW

POLOZOLA, Chief Judge.

The United States[1] has filed a motion[2] to disqualify Lewis Unglesby and the law firms of Unglesby and Koch and Unglesby, Koch and Reynolds[3] from representing the defendant Stephen Edwards in these proceedings. After conducting an evidentiary hearing spanning several days,[4] the Court took the motion under advisement. For reasons which follow,[5] the Court finds that Lewis Unglesby and the law firms of Unglesby and Koch and Unglesby, Koch and Reynolds are disqualified from representing Stephen Edwards in this case.

## I. Background

In seeking the disqualification of Mr. Unglesby and his law firm, the Government contends that Mr. Unglesby previously represented two other co-defendants in this case, Robert J. Guidry and Edward DeBartolo. Mr. Guidry and Mr. DeBartolo have pled guilty to offenses directly related to the charges set forth in the indictment[6] returned against Stephen Edwards and five other defendants.[7] The Government asserts that both Mr. Guidry and Mr. DeBartolo will be government witnesses at the trial. At the time Mr. Guidry and Mr. DeBartolo entered their guilty pleas and at the time each testified at the hearing the Court conducted on the motion to disqualify, they were represented by different counsel. In their affidavits filed with the Court and in their testimony presented at the hearing, both Mr. Guidry and Mr. DeBartolo asserted their attorney-client privilege with Mr. Unglesby and his law firm. Mr. Guidry and Mr. DeBartolo also stated that they did not and would not waive their attorney-client privileges with Mr. Unglesby and his law firm.

### The Government's Contentions

In support of its motion to disqualify, the Government contends that: (1) Mr. Unglesby and his law firm have two separate actual conflicts because two co-defendants whom he previously represented have pled guilty and will testify on behalf of the Government; (2) Mr. Unglesby's prior representations were directly with Mr. DeBartolo and Mr. Guidry and arose out of gaming proceedings and suitability determinations conducted by the Louisiana State Police, contemporaneous with and substantively overlapping with criminal activities charged in the indictment; (3) Mr. Unglesby's conflicts of interest are unavoidable inasmuch as Mr. Guidry and Mr. DeBartolo are central to the alleged criminal conduct of Stephen Edwards; (4) neither Mr. Guidry nor Mr. DeBartolo assents to waiver of individual loyalty and confidentiality from Mr. Unglesby; and (5) the appearance of conflicts of interest is overwhelming.

In their argument and supplemental briefs, the Government contends that nothing short of disqualification is proper under the facts of this case.

1. The United States will sometimes be referred to as the Government.

2. Rec.Doc. No. 20.

3. These firms will sometimes be referred to as the Unglesby law firm.

4. *See* Fed.R.Civ.Proc. 44(c) (1992) and *United States v. Garcia*, 517 F.2d 272 (5th Cir.1975).

5. The Court has considered all of the contentions of the parties whether or not specifically discussed herein.

6. Rec.Doc. No. 1.

7. On October 16, 1998, Mr. Guidry pled guilty to conspiracy in violation of Title 18, U.S.C. § 371. Earlier, on October 6, 1998, Mr. DeBartolo pled guilty to misprision of a felony in violation of Title 18, United States Code Section 4.

## B. Stephen Edwards' Contentions

Stephen Edwards [8] and Mr. Unglesby and his law partner Karl Koch strenuously argue that no attorney-client relationship existed between Mr. Unglesby and his law firm and Mr. Guidry and Mr. DeBartolo. More specifically, Stephen Edwards and his lawyers contend that: (1) Stephen Edwards has the right to counsel of his choice; (2) no attorney-client relationship existed between Mr. Unglesby and Mr. Guidry and Mr. DeBartolo because Mr. Unglesby only represented their corporations, A–Ace Video Gaming Company ("A–Ace") and DeBartolo Entertainment Louisiana Gaming, Inc. ("DeBartolo Entertainment"), respectively; (3) Mr. DeBartolo never gave Mr. Unglesby any confidential or privileged information that was not subsequently given to the Louisiana State Police; (4) Mr. DeBartolo has waived any attorney-client privilege, if one did exist, because of the reasons set forth in number (3) and because he signed and participated in the Joint Defense Agreement; [9] (5) Mr. DeBartolo knew that Mr. Unglesby was representing Stephen Edwards and did not object; (6) Mr. DeBartolo waived the privilege when his counsel inadvertently produced certain privileged documents; (7) Mr. Guidry sold A–Ace in 1997 and cannot assert a privilege; (8) Mr. Guidry was aware that Mr. Unglesby represented Stephen Edwards and did not object; (9) Mr. Unglesby does not know any information about Mr. Guidry that Stephen Edwards does not already know; and (10) Mr. Guidry waived all objections or claims of privilege by signing the Joint Defense Agreement.

In addition, Stephen Edwards argues that the Government filed the disqualification motion to gain a tactical advantage against him by disqualifying his counsel who are very capable attorneys and have knowledge of and expertise in various issues involved in this case.

In the alternative, Stephen Edwards and Mr. Unglesby contend that if the Court finds there was an attorney-client relationship between Mr. Unglesby, Mr. DeBartolo and Mr. Guidry, Stephen Edwards will waive the conflict. Stephen Edwards and Mr. Unglesby also agree that Mr. Unglesby will not cross-examine Mr. Guidry or Mr. DeBartolo if Mr. Unglesby is allowed to stay in the case.

## II. Defendant's Right To Counsel

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." [10] It is clear this constitutional right to counsel "was designed to assure fairness in the adversary criminal process." [11] While it is true that great deference should be given to a defendant's choice of counsel, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." [12] Thus, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." [13]

---

**8.** Stephen Edwards has also enrolled as counsel for himself in this case.

**9.** The Joint Defense Agreement submitted into evidence at the hearing (Government's Exhibit # 9, filed under seal) is not signed by Mr. DeBartolo, although Mr. DeBartolo testified during the disqualification hearing that he did sign the Agreement after review by his attorney, Jack Martzell.

**10.** U.S. Const. amend. VI.

**11.** *Wheat v. United States*, 486 U.S. 153, 158, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

**12.** *United States v. Cronic*, 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046, n. 21, 80 L.Ed.2d 657 (1984); *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697.

**13.** *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697; *United States v. Vasquez*, 995 F.2d 40, 41 (5th Cir.1993).

■ In resolving the issues before the Court on the pending motion, the Court notes that the two co-defendants who have already pled guilty, Mr. Guidry and Mr. DeBartolo, are entitled to the same right to counsel under the Sixth Amendment as is Stephen Edwards. The fact that the two co-defendants have pled guilty while Stephen Edwards has entered a not guilty plea does not strip Mr. Guidry and Mr. DeBartolo of their right to counsel or their attorney-client privilege with former or current counsel. The Court now turns to a discussion of the attorney-client privilege.

## III. Attorney–Client Privilege

### A. Background and Purpose

■ The "attorney client privilege is one of the oldest recognized privileges for confidential communications." [14] Thus, in federal criminal cases, the federal law of privileges applies.[15] In order for an attorney-client privilege to exist, there must be an attorney-client relationship between an attorney and a client. The existence of an attorney-client relationship is a question of fact to be determined by the district court.[16] The test for determining whether an attorney-client relationship exists is a subjective one and hinges on the client's belief that he or she is consulting the lawyer in his professional capacity with the intention of seeking professional legal advice.[17] However, this subjective belief must be a reasonable one.[18] An attorney-client relationship and privilege may exist even though the attorney's fees are paid by a third person.[19]

### B. Statutory Basis for the Privilege

Rule 501 of the Federal Rules of Evidence serves as the foundation for the attorney-client evidentiary privilege in federal court.[20] Rule 501 provides that "the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." [21] Louisiana law also provides a statutory attorney-client privilege. Article 506 of the Louisiana Code of Evidence clearly sets forth the attorney-client privilege:

> A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating

14. *Swidler & Berlin v. United States*, 524 U.S. 399, 118 S.Ct. 2081, 2084, 141 L.Ed.2d 379 (1998).

15. *United States v. Meagher*, 531 F.2d 752 (5th Cir.1976); *United States v. Craig*, 528 F.2d 773 (7th Cir.1976); *United States v. Simmons*, 964 F.2d 763 (8th Cir.1992); *In re Grand Jury Proceedings*, 867 F.2d 562 (9th Cir.1989).

16. Fed.R.Evid. 104(a); *Steiner v. United States*, 134 F.2d 931 (5th Cir.1943); *Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120 (4th Cir.1994).

17. *Grace v. Center for Auto Safety*, 72 F.3d 1236 (6th Cir.1996); *Glover v. Libman*, 578 F.Supp. 748 (N.D.Ga.1983); *Excalibur Oil, Inc. v. Sullivan*, 616 F.Supp. 458 (N.D.Ill. 1985); *Dalrymple v. National Bank and Trust Co. of Traverse City*, 615 F.Supp. 979 (W.D.Mich.1985). *See also* McCormick On Evidence, § 88 (John William Strong, ed., West Publishing) (1992); 8 Wigmore, Evidence § 2304 (McNaughton rev.1961).

18. *Green v. Montgomery County, Ala.*, 784 F.Supp. 841 (M.D.Ala.1992); *Ageloff v. Noranda, Inc.*, 936 F.Supp. 72 (D.R.I.1996); *Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc.*, 903 F.Supp. 253 (D.P.R.1995); *DCA Food Indus., Inc. v. Tasty Foods, Inc.*, 626 F.Supp. 54 (W.D.Wis.1985).

19. *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989). *See also Freund v. Butterworth*, 117 F.3d 1543 (11th Cir.1997) (whether party consulting attorney ever paid attorney is not dispositive as to whether an attorney-client relationship was established); *Grace v. Center for Auto Safety*, 72 F.3d 1236 (6th Cir.1996) (formation of attorney-client relationship is not dependent on payment of fees).

20. *Rubin v. United States*, — U.S. —, 119 S.Ct. 461, 462, 142 L.Ed.2d 413 (1998).

21. Fed.R.Evid. 501.

the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication, when the communication is:

(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.

(2) Between the lawyer and a representative of the lawyer.

(3) By the client or his lawyer, or a representative of either, to a lawyer, or representative of a lawyer, who represents another party concerning a matter of common interest.

(4) Between representatives of the client or between the client and a representative of the client.

(5) Among lawyers and their representatives representing the same client.

(6) Between representatives of the client's lawyer.[22]

Article 506 further provides that the privilege may be claimed by "the client, the client's agent or legal representative, or the successor, trustee, or similar representative of a client that is a corporation . . . ."[23]

■■ At the core of the motion before the Court is the existence of attorney-client relationships and privileges. The attorney-client privilege is an evidentiary privilege which protects communications made in confidence by a client to his attorney for the purpose of obtaining legal advice from disclosure in judicial proceed-ings. The privilege also protects "the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication."[24] "The notion that the loyalty owed by the lawyer to his client disables him from being a witness in his client's case is deep-rooted in Roman law."[25] "This Roman tradition may have been influential in developing the attorney-client privilege, which is the oldest of the privileges for confidential communications known to the common law."[26] "Its purpose is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends on the lawyer's being fully informed by the client."[27] The privilege only protects disclosure of confidential communications between the client and attorney; it does not protect disclosure of underlying facts.[28] These latter principles will be discussed in more detail later in this opinion.

### C. Elements Required to Recognize an Attorney–Client Privilege

■ The elements required for recognition of the attorney-client privilege are as follows:

(1) the asserted holder of the privilege is or sought to become a client;

(2) the person to whom the communication was made (a) is (the) member of a

---

22. La.R.Evid. 506(B).

23. La.R.Evid. 506(D).

24. La.R.Evid. 506.

25. *Succession of Smith v. Kavanaugh, Pierson & Talley,* 513 So.2d 1138, 1142 (La.1987), *citing* McCormick On Evidence, § 87, at 204 (3d ed.1984).

26. *Succession of Smith,* 513 So.2d at 1142, *citing* 8 J. Wigmore, Evidence § 2290 (McNaughton rev.1961).

27. *Succession of Smith,* 513 So.2d at 1142, *citing Upjohn Co. v. United States,* 449 U.S. 383, 390–93, 101 S.Ct. 677, 683–84, 66 L.Ed.2d 584, 592–93 (1981).

28. *Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981); *In re Six Grand Jury Witnesses,* 979 F.2d 939 (2d Cir.1992); *United States v. Freeman,* 619 F.2d 1112 (5th Cir.1980); *Computer Network Corp. v. Spohler,* 95 F.R.D. 500 (D.D.C.1982).

bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;

(3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding and not (d) for the purpose of committing a crime or tort; and

(4) the privilege has been (a) claimed and (b) not waived by the client.[29]

The rationale for the privilege was described by the Louisiana Supreme Court in *Succession of Smith v. Kavanaugh, Pierson & Talley* as follows:

The lawyer's exemption from disclosing his client's secrets is justified on the ground that claims and disputes which may lead to litigation can most justly and expeditiously be handled by practiced experts, namely lawyers, and that these experts can act effectively only if they are advised of the facts by the parties whom they represent. Full disclosure will be promoted if the client knows that what he tells his lawyer cannot, over his objection, be extorted in court from his lawyer's lips. The privilege also promotes compliance with the law, particularly in complex areas of business law such as antitrust, securities, and tax. The attorney to whom confidences are freely expressed has a greater opportunity to learn of and counsel against potentially unlawful conduct.[30]

## D. The Obligation of Loyalty and Confidentiality Does Not End with the Termination of the Case or the Relationship

 An attorney must preserve the confidences of one who has employed him.[31] This obligation continues even after termination of the attorney-client relationship.[32] This duty of confidentiality is broader than the evidentiary attorney-client privilege[33] and applies not only to matters communicated to the attorney in confidence by the client, but to all information relating to the representation, whatever its source.[34] Furthermore, the disclosure or use of confidences is forbidden even though there are other available sources of such information, including the situation in which information obtained by the attorney from his former client may be available to his present client.[35] An attorney may not reveal client confidences if to do so would prejudice that client.[36] Not only should an attorney preserve the confidences and secrets of his client, but the attorney should always avoid even the appearance of impropriety in doing so.[37] Furthermore, the attorney should not place himself in a position where there

---

29. *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.1978).

30. *Succession of Smith*, 513 So.2d at 1142 (citation omitted).

31. *See, e.g., Levin v. Ripple Twist Mills, Inc.*, 416 F.Supp. 876 (E.D.Pa.1976).

32. *See, e.g., United States v. Culp*, 934 F.Supp. 394 (M.D.Fla.1996); *Beck v. Board of Regents of State of Kan.*, 568 F.Supp. 1107 (D.Kan. 1983); *Davis v. Stamler*, 494 F.Supp. 339 (D.N.J.1980).

33. *See, e.g., Heartbreak Cabaret Corp. v. Cruz Toledo Restaurant Corp.*, 699 F.Supp. 1066 (S.D.N.Y.1988); *Cannon v. U.S. Acoustics Corp.*, 398 F.Supp. 209 (N.D.Ill.1975).

34. *See, e.g., United States v. James*, 708 F.2d 40 (2d Cir.1983); *Dworkin v. General Motors Corp.*, 906 F.Supp. 273 (E.D.Pa.1995).

35. *See, e.g., Freund v. Butterworth*, 117 F.3d 1543 (11th Cir.1997); *Marco v. Dulles*, 169 F.Supp. 622 (S.D.N.Y.1959).

36. *See, e.g., Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168 (5th Cir.1979); *Clark v. Bank of New York*, 801 F.Supp. 1182 (S.D.N.Y.1992).

37. *See, e.g., General Elec. Co. v. Valeron Corp.*, 428 F.Supp. 68 (E.D.Mich.1977).

may be the temptation to take advantage of information derived from confidential communications.[38] The duty of confidentiality is imputed to all of the partners of the attorney's firm.[39] A federal court, in the exercise of its duty to supervise members of its bar, has a duty to support the strong public interest in preserving client confidences and in preserving the integrity of the litigation process.[40]

The United States Supreme Court discussed the issue of loyalty and attorney-client privilege in cases of multiple client representation in *Cuyler v. Sullivan*.[41] In *Strickland v. Washington*, the Supreme Court explained its *Cuyler* decision and why *Cuyler* imposes a lower threshold for reversal of a conviction than does *Strickland*:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice [than a case in which the defendant effectively had no counsel]. In *Cuyler v. Sullivan*, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth

Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."[42]

An en banc court of the Fifth Circuit analyzed the distinction between loyalty in cases of multiple client representation from that in self-interest cases in *Beets v. Scott*.[43] The Fifth Circuit noted:

> The reason for distinguishing multiple representation conflicts from those involving self-interest is clear. When multiple representation exists, the source and consequences of the ethical problem are straightforward:. "counsel represents two clients with competing interests and is torn between two duties. Counsel can properly turn in no direction. He must fail one or do nothing and fail both."[44]

The en banc court in *Beets* also noted that the effects of breaching the duty of loyalty are clearest in multiple representation cases:

> Because multiple defendant representation poses a unique, straightforward danger of conflict, the *Cuyler* rule of "not quite per se" prejudice makes eminent sense. A defendant whose attorney "actively represented conflicting interests" has had no real lawyer secured to him by the Sixth Amendment. As Justice Powell put it in *Cuyler*, "[t]he conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel.'" Moreover, this type of conflict may be addressed by a prophylactic

---

38. *See, e.g., Westinghouse Elec. Corp. v. Rio Algom Ltd.*, 448 F.Supp. 1284 (N.D.Ill.1978).

39. *See, e.g., United States v. Falzone*, 766 F.Supp. 1265 (W.D.N.Y.1991); *Federal Sav. & Loan Ins. Corp. v. Fielding*, 343 F.Supp. 537 (D.Nev.1972).

40. *See, e.g., Warpar Mfg. Corp. v. Ashland Oil, Inc.*, 606 F.Supp. 852 (N.D.Ohio 1984).

41. 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

42. 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) (citations omitted).

43. 65 F.3d 1258 (5th Cir.1995).

44. *Beets*, 65 F.3d at 1270 (citations omitted).

rule, whereby a court, made aware of multiple representation, can insure early in the criminal proceeding that the client has been informed of the pitfalls of multiple representation and knowingly waived any conflict. As *Strickland* pointed out, "Given ... the ability of trial courts to make early inquiry in situations likely to give rise to conflicts, ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest."

But only in the multiple representation context is the duty of loyalty so plain. Only then is the risk of harm high enough to employ a near-per se rule of prejudice. While loyalty may be implicated in other judgments a lawyer makes, in no other category of conflicts is the risk of prejudice so certain as to justify an automatic presumption.[45]

It is interesting to note that the United States Supreme Court continues to take a deep interest in cases involving the attorney-client relationship. Prior to its decision in *Cuyler* and *Strickland,* the Supreme Court considered multiple representation cases in *Glasser v. United States*[46] and *Holloway v. Arkansas.*[47] Four later cases clarified *Cuyler: Wood v. Georgia;*[48] *Nix v. Whiteside;*[49] *Strickland v. Washington;*[50] and *Burger v. Kemp.*[51] More recently, the United States Supreme Court has decided *Wheat v. United States,*[52] and *Swidler & Berlin v. United States*[53] Each of these cases sets forth guidelines which are very appropri-

ate and applicable to the case now pending before the Court. In *Wheat,* the Supreme Court noted that a defendant's "Sixth Amendment right to choose one's own counsel is circumscribed in several important respects."[54] One limitation involves employing counsel who previously represented another party in a related matter. The Supreme Court held:

> Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government. The question raised in this case is the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy.[55]

In expressing its concerns about lawyers involved in multiple representation cases, the Supreme Court stated:

> In previous cases, we have recognized that multiple representation of criminal defendants engenders special dangers of which a court must be aware. While "permitting a single attorney to represent co-defendants ... is not per se violative of constitutional guarantees of effective assistance of counsel," a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel. As we said in Holloway:

---

**45.** *Beets,* 65 F.3d at 1270–71 (citations omitted).

**46.** 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

**47.** 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

**48.** 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).

**49.** 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

**50.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**51.** 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

**52.** 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

**53.** 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).

**54.** *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697.

**55.** *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697.

"Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing .... [A] conflict may ... prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another." [56]

The Supreme Court in *Wheat* set forth the duty of a federal judge when the judge is confronted with a multiple representation case. After first stating that a waiver by all the affected defendants does not cure all problems in these types of cases, the Supreme Court issued the following mandate:

Petitioner insists that the provision of waivers by all affected defendants cures any problems created by the multiple representation. But no such flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice. Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. Both the American Bar Association's Model Code of Professional Responsibility and its Model Rules of Professional Conduct, as well as the rules of the California Bar Association (which governed the attorneys in this case), impose limitations on multiple representation of clients. Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

For this reason, the Federal Rules of Criminal Procedure direct trial judges to investigate specially cases involving joint representation. In pertinent part, Rule 44(c) provides:

"[T]he court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

Although Rule 44(c) does not specify what particular measures may be taken by a district court, one option suggested by the Notes of the Advisory Committee is an order by the court that the defendants be separately represented in subsequent proceedings in the case. This suggestion comports with our instructions in *Holloway* and in *Glasser v. United States*, that the trial courts, when alerted by objection from one of the parties, have an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment.[57]

The United States Supreme Court specifically addressed the issue of the permanency of the attorney-client privilege in *Swidler & Berlin v. United States*.[58] The Court's decision in *Swidler* reinforces the sanctity of this evidentiary privilege in holding that the attorney-client privilege survives the death of the client. The Supreme Court held that the notes taken by an attorney prior to the client's death were protected by the attorney-client privilege. In so holding, the Court reaffirmed the purpose of upholding the attorney-client privilege:

---

**56.** *Wheat,* 486 U.S. at 159–60, 108 S.Ct. at 1697 (citations omitted).

**57.** *Wheat,* 486 U.S. at 160–61, 108 S.Ct. at 1697–98 (citations omitted).

**58.** 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).

The attorney client privilege is one of the oldest recognized privileges for confidential communications. The privilege is intended to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." The issue presented here is the scope of that privilege; more particularly, the extent to which the privilege survives the death of the client.

. . . .

Clients consult attorneys for a wide variety of reasons, only one of which involves possible criminal liability. Many attorneys act as counselors on personal and family matters, where, in the course of obtaining the desired advice, confidences about family members or financial problems must be revealed in order to assure sound legal advice. The same is true of owners of small businesses who may regularly consult their attorneys about a variety of problems arising in the course of the business. **These confidences may not come close to any sort of admission of criminal wrongdoing, but nonetheless be matters which the client would not wish divulged.**[59]

Although Stephen Edwards and his attorneys have argued that based on their understanding of the facts, there would be no harm to Mr. Guidry or Mr. DeBartolo, the Supreme Court in *Swidler* refused to carve out of the privilege a "no harm exception."[60] The Court held that a "'no harm in one more exception' rationale could contribute to the general erosion of the privilege, without reference to common law principles or 'reason and experience.'"[61] The same considerations the *Swidler* Court found to weigh in favor of a

posthumous application of the privilege also apply after the work performed by counsel has been completed on behalf of the client. These considerations include: (1) the assurance that "communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel;"[62] and (2) "[c]lients may be concerned about reputation, civil liability, or possible harm to friends or family."[63] The Court also noted that "[p]osthumous disclosure of such communications may be as feared as disclosure *during the client's lifetime.*"[64]

## E. Ethical Considerations

The attorney-client privilege and an attorney's ethical duties are closely intertwined. This relationship is described by Professor McCormick in his treatise on evidence:

At the present time it seems most realistic to portray the attorney-client privilege as supported in part by its traditional utilitarian justification, and in part by the integral role it is perceived to play in the adversary system itself. Our system of litigation casts the lawyer in the role of fighter for the party whom he represents. A strong tradition of loyalty attaches to the relationship of attorney and client, and this tradition would be outraged by routine examination of the lawyer as to the client's confidential disclosures regarding professional business. To the extent that the evidentiary privilege, then, is integrally related to an entire code of professional conduct, it is futile to envision drastic curtailment of the privilege without substantial modification of the underlying ethical system to which the privilege is merely ancillary.[65]

---

59. *Swidler,* 118 S.Ct. at 2084, 2086 (citations omitted) (emphasis added).

60. *Swidler,* 118 S.Ct. at 2087.

61. *Swidler,* 118 S.Ct. at 2087.

62. *Swidler,* 118 S.Ct. at 2086.

63. *Swidler,* 118 S.Ct. at 2086.

64. *Swidler,* 118 S.Ct. at 2086 (emphasis added).

Thus, the norms embodied in ethical rules are relevant to the Court's inquiry in this motion to disqualify Stephen Edwards' counsel.[66]

Rule 1.6 of the Louisiana Rules of Professional Conduct [67] deals with confidentiality of information and provides in pertinent part:

> (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in Paragraph (b).[68]

The comments under American Bar Association Rule 1.6 provide in part:

> The observance of the ethical obligation of a lawyer to hold inviolate confidential information of the client not only facilitates the full development of facts essential to proper representation of the client but also encourages people to seek early legal assistance.

> Almost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws and regulations, deemed to be legal and correct. The common law recognizes that the client's confidences must be protected from disclosure. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld.

> A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. The client is thereby encouraged to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter.[69]

Loyalty of an attorney to his client and avoidance of conflicts of interest are addressed by Rule 1.7 of the Louisiana Rules of Professional Conduct, as follows:

> Loyalty is an essential element in the lawyer's relationship to a client. Therefore:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

> (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

> (2) Each client consents after consultation.[70]

Conflicts of interest with regard to representation of former clients is embodied in Rule 1.9, as follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter;

> (a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

> (b) Use information relating to the representation to the disadvantage of

**65.** McCormick On Evidence, § 87, at 316–17 (John William Strong, ed., West Publishing) (1992).

**66.** *Federal Deposit Ins. Corp. v. United States Fire Ins. Co.,* 50 F.3d 1304, 1311–12 (5th Cir.1995). *See also In re American Airlines, Inc.,* 972 F.2d 605 (5th Cir.1992).

**67.** La.Rules of Prof'l Conduct Rule 1.6(a) (1986). Louisiana's Rules of Professional Conduct track the American Bar Association's Model Rules of Professional Conduct (1983). Pursuant to Local Rule 83.2.4M, the Rules of

Professional Conduct of the Louisiana State Bar Association promulgated by the Louisiana Supreme Court and in effect on May 15, 1998 are adopted by the Middle District of Louisiana.

**68.** The exceptions set forth in Paragraph (b) do not apply under the facts of this case.

**69.** ABA Model Rules of Prof'l Conduct Rule 1.6 cmts. 2–4 (1983).

**70.** La.Rules of Prof'l Conduct Rule 1.7(a) (1986).

the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.[71]

Representation of an organization is provided for pursuant to Rule 1.13, as follows:

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.[72]

### F. The Attorney–Client Relationship When a Corporation is involved.

The record in this case reveals that Mr. Guidry and Mr. DeBartolo each owned one hundred percent of the stock in the two corporations which were represented by Mr. Unglesby. Mr. Unglesby argues that he only represented the corporations, while Mr. Guidry and Mr. DeBartolo contend that Mr. Unglesby and his law firm also had attorney-client relationships with them individually.

The existence of an attorney-client privilege has been upheld in the context of counsel's representation of a corporate entity.[73] Unique circumstances can arise when considering the attorney-client privilege in the context of corporate representation. The court in *In Re Grand Jury Proceedings* noted that in the context of corporate representation, "corporate attorneys need an absolute privilege so that they can obtain candid information from corporate employees and provide competent legal advice to the corporation." [74]

One of the leading cases on the issue of the scope of the attorney-client privilege in the case of corporate representation is *Up-john Co. v. United States.*[75] A corporate employee in *Upjohn* asserted the attorney-client privilege as to communications he had made to the corporate attorney.[76] The Court of Appeals had restricted the privilege to the "control group," which it defined as those officers who play a "substantial role in deciding and directing a corporation's legal response." [77] The Supreme Court noted that "[a]dmittedly complications in the application of the privilege arise when the client is a corporation, which in theory is an artificial creature of the law, and not an individual; but this Court has assumed that the privilege applies when the client is a corporation." [78]

The Supreme Court ultimately rejected the "control group" test, finding that it frustrated the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation. In extending the attorney-client privilege to communications made by the corporate employee who was beyond the "control group," the Supreme Court stated the following:

> In the case of the individual client the provider of information and the person who acts on the lawyer's advice are one and the same. In the corporate context, however, it will frequently be employees ... who will possess the information needed by the corporation's lawyers.[79]
>
> . . . .
>
> No abstractly formulated and unvarying "test" will necessarily enable courts to

**71.** La.Rules of Prof'l Conduct Rule 1.9 (1986).

**72.** La.Rules of Prof'l Conduct Rule 1.13(a) (1986).

**73.** *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

**74.** 5 F.Supp.2d 21, 35 (D.D.C.1998) (citation omitted).

**75.** 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

**76.** *Upjohn*, 449 U.S. at 388, 101 S.Ct. at 682.

**77.** *Upjohn*, 449 U.S. at 393, 101 S.Ct. at 684. It is clear that both Mr. Guidry and Mr. DeBartolo would have come within the control group test.

**78.** *Upjohn*, 449 U.S. at 389–90, 101 S.Ct. at 682–83 (citations omitted).

**79.** *Upjohn*, 449 U.S. at 391, 101 S.Ct. at 683.

decide questions such as this with mathematical precision. But if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.[80]

The Supreme Court was careful to note that determinations of the scope of the attorney-client privilege in the corporate context are fact-intensive and must be decided on a "case-by-case" basis.[81] Examining each set of facts "obeys the spirit of the Rules" and is consistent with the considerations set forth in Federal Rules of Evidence Rule 501.[82]

The Fifth Circuit has recognized the divided allegiances which can arise on the part of an attorney in the context of corporate representation in *Brennan's Inc. v. Brennan's Restaurants, Inc.*[83] The *Brennan's* case dealt with the Brennan family's corporate entities, all of which were owned and closely held by various members of the Brennan family. Edward Wegmann served as general counsel for the family businesses. In 1973, a dispute arose within the family regarding the operation and management of the family businesses, resulting in division of the corporations' stock between the two opposing family groups. Wegmann continued to represent one faction and severed his connection with the other. Both factions claimed ownership of the family trademarks, and one faction filed suit against the other faction for trademark infringement and unfair competition. Wegmann was counsel for the defendant faction, and plaintiff moved for his disqualification on the basis of his prior representation of the plaintiffs in the family businesses.

Relying primarily on the canons of professional responsibility, the Fifth Circuit affirmed the trial court's disqualification of Wegmann, stating:

> But the ethical duty is broader than the evidentiary privilege: "This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge." "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client...." The use of the word "information" in these Ethical Considerations as opposed to "confidence" or "secret" is particularly revealing of the drafters' intent to protect all knowledge acquired from a client, since the latter two are defined terms. Information so acquired is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. **This is true without regard to whether someone else may be privy to it. The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter.**[84]

As a general rule, an attorney for a corporation represents the corporation, and not its shareholders.[85] The issue

---

**80.** *Upjohn,* 449 U.S. at 393, 101 S.Ct. at 684.

**81.** *Upjohn,* 449 U.S. at 396–97, 101 S.Ct. at 686.

**82.** *Upjohn,* 449 U.S. at 396–97, 101 S.Ct. at 686.

**83.** 590 F.2d 168 (5th Cir.1979).

**84.** *Brennan's,* 590 F.2d at 172 (citations omitted) (emphasis added).

**85.** *Sackley v. Southeast Energy Group, Ltd.,* 1987 WL 12950 (N.D.Ill.1987). *See also* La. Rules of Prof'l Conduct Rule 1. 13(a) (1986) (contained in Title 37, Chapter 4, Article XVI of the Louisiana Revised Statutes).

of attorney-client relationship becomes more complicated in the case of a small closely-held corporation with only a few shareholders or directors. In such cases, the line between individual and corporate representation can become blurred.[86] The determination whether the attorney represented the individual of the small closely-held corporation is fact-intensive and must be considered on a case-by-case basis.[87] The court in *Rosman v. Shapiro* noted that although corporate counsel does not ordinarily become counsel for the shareholders and directors, in a closely-held corporation consisting of only two shareholders, "it is indeed reasonable for each shareholder to believe that the corporate counsel is in effect his own individual attorney."[88] The court in *Sackley v. Southeast Energy Group, Ltd.* set forth a number of factors which could be considered: (1) "whether the attorney ever represented the shareholder in individual matters"; (2) "whether the attorneys' services were billed to and paid by the corporation"; (3) "whether the shareholders treat the corporation as a corporation or as a partnership"; and (4) "whether the shareholder could reasonably have believed that the attorney was acting as his individual attorney rather than as the corporation's attorney."[89]

In *Rosman*, the court found that counsel for the closely-held corporation consisting of two fifty-percent shareholders not only represented the corporate entity, but the individual shareholders as well.[90] The two shareholders in *Rosman* formed the corporation "solely to facilitate the transaction which is the focus of the dispute in the two instant actions."[91] Such is the reason DeBartolo Entertainment was formed in the present case. Mr. DeBartolo testified that DeBartolo Entertainment was formed exclusively for the purpose of obtaining the fifteenth riverboat license, which transaction is at issue in the indictment. The *Rosman* court stated that "[i]n short, **it would exalt form over substance** to conclude that Y & Y only represented Filtomat, solely because Rosman and Shapiro chose to deal with [another corporation] through a corporate entity."[92]

## IV. Analysis

### A. Burden of Proof for Disqualification

■ The Fifth Circuit has set forth the burden of proof required on a motion for disqualification in *In re American Airlines, Inc.*,[93] as follows:

A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations.[94]

### B. Issues Concerning Mr. DeBartolo

#### 1. First Element: Attorney–Client Relationship

■ In the present case, the Government argues that an attorney-client relationship exists between Mr. Unglesby and

**86.** *Rosman v. Shapiro*, 653 F.Supp. 1441, 1445 (S.D.N.Y.1987); *Bobbitt v. Victorian House, Inc.*, 545 F.Supp. 1124, 1126 (N.D.Ill. 1982).

**87.** *Rosman*, 653 F.Supp. at 1445; *Bobbitt*, 545 F.Supp. at 1126.

**88.** *Rosman*, 653 F.Supp. at 1445.

**89.** *Sackley*, 1987 WL 12950 at *3 (citations omitted).

**90.** *Rosman*, 653 F.Supp. at 1445.

**91.** *Rosman*, 653 F.Supp. at 1445, n. 8.

**92.** *Rosman*, 653 F.Supp. at 1445 (emphasis added).

**93.** *In re American Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir.1992).

**94.** *In re American Airlines*, 972 F.2d at 614 (citations omitted).

Mr. DeBartolo. As noted earlier Mr. DeBartolo pled guilty and will testify as a witness for the Government. Mr. Unglesby asserts that he only served as legal counsel for DeBartolo Entertainment, a corporation of which Mr. DeBartolo was the sole owner and one-hundred percent shareholder.

The nature and scope of Mr. Unglesby's representation of DeBartolo Entertainment must be closely examined. According to the testimony adduced at the hearing on the motion to disqualify, DeBartolo Entertainment was formed for the sole purpose of obtaining a riverboat license. Mr. Unglesby served as local counsel to manage the application process and ensure that the appropriate documentation was presented in a timely fashion. Corporate documents, financial records, and all other information which was necessary to the application process for a riverboat license were sent to Mr. Unglesby from California. Mr. Unglesby was present with Mr. DeBartolo during his interview with the State Police pursuant to the Louisiana Gaming Control Law.[95]

The provisions of the Louisiana Gaming Control Law are significant to the issue of whether an attorney-client relationship existed between Mr. Unglesby and Mr. DeBartolo. The State of Louisiana, through the riverboat gaming enforcement division, was authorized to issue fifteen licenses to conduct gaming activities on a riverboat.[96] To be eligible to receive a license to conduct gaming operations on a riverboat, the applicant had to meet **suitability requirements and the applicant had to be "a person of good character, honesty, and integrity."**[97] Moreover, Section 70(A)(2) requires that:

> **The applicant is a person whose prior activities, criminal record, if any, reputation, habits, and associations do not pose a threat** to the public interest of this state or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of gaming or the carrying on of the business and financial arrangements incidental thereto.[98]

Additionally, Section 76 of the Louisiana Gaming Control Law sets out criteria for disqualification of an applicant. Paragraph six requires disqualification "[i]f the applicant is a corporation ... of which any individual holding five percent or more interest in the profits or losses has been convicted of, or pled guilty or nolo contendre to, an offense which at the time of conviction is punishable as a felony."[99] This indicates that the suitability of the individuals comprising the corporation is relevant in the application process.

As previously stated, Mr. DeBartolo testified at the hearing the he was the sole owner and one-hundred percent shareholder of DeBartolo Entertainment and that the corporation was formed for the purpose of obtaining a riverboat license.

Although DeBartolo Entertainment was a corporate applicant, the record reveals and this Court finds that it was the suitability, character, reputation, integrity, honesty, criminal record, habits, and prior activities of **Mr. DeBartolo, the individual** that the division was scrutinizing throughout the application process. **For purposes of determining suitability of an applicant seeking a license to operate a riverboat, DeBartolo Entertainment, the corporation, and Mr. DeBartolo, the in-**

---

**95.** La.Rev.Stat.Ann. §§ 27:1 et seq (Supp. 1999).

**96.** La.Rev.Stat.Ann. §§ 27:44(6), 27:65 (Supp. 1999) (the "division" is defined as "the riverboat gaming enforcement division of the gaming enforcement section of the office of state police, public safety services, Department of Public Safety and Corrections.").

**97.** La.Rev.Stat.Ann. 27:70(A)(1) (Supp.1999) (emphasis added).

**98.** La.Rev.Stat.Ann. 27:70(A)(2) (Supp.1999) (emphasis added).

**99.** La.Rev.Stat.Ann. § 27:76(6) (Supp.1999).

dividual, were indistinguishable.[100] It was for the purpose of proving Mr. DeBartolo's suitability to the division that Mr. Unglesby was hired. Mr. Unglesby attended the meeting in which Mr. DeBartolo was interviewed by the division. Under these particular circumstances, to say that Mr. Unglesby had an attorney-client relationship with only DeBartolo Entertainment and not with Mr. DeBartolo would be "exalt[ing] form over substance."[101] The nature and extent of Mr. Unglesby's representation is dispositive under these circumstances. Mr. DeBartolo's expectation that there existed an attorney-client relationship with Mr. Unglesby was reasonable under the facts of this case. The Court must now determine if the prior representation bears a substantial relationship to the indictment returned against Stephen Edwards.

### 2. Second Element: Substantial Relationship

The Fifth Circuit has adopted the "substantial relationship" test in matters of disqualification and prior representation.[102] The Fifth Circuit's opinion in *In re American Airlines, Inc.* explained the Court's requirement of a "substantial relationship" by stating that such a relationship "may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and the court engages in a 'painstaking analysis of the facts and precise application of prece-

dent.' " [103] The following excerpt is explanatory:

> A party seeking to disqualify counsel under the substantial relationship test need not prove that the past and present matters are so similar that a lawyer's continued involvement threatens to taint the trial. Rather, the former client must demonstrate that the two matters are substantially related. Second, we adhere to our precedents in refusing to reduce the concerns underlying the substantial relationship test to a client's interest in preserving his confidential information. The second fundamental concern protected by the test is not the public interest in lawyers avoiding "even the appearance of impropriety," but **the client's interest in the loyalty of his attorney.**[104]

■ The Court finds under the facts of this case that there existed an attorney-client relationship between Mr. Unglesby and Mr. DeBartolo with regard to the application for the fifteenth riverboat license. It is precisely this fifteenth riverboat license which is at issue in numerous counts of the indictment.[105]

Both Stephen Edwards and Edwin Edwards are charged in numerous counts of the indictment with both substantive and conspiracy counts as well as a violation of Title 18, United States Code Section 2, the aiding and abetting statute, in connection

---

**100.** The Court's finding that Mr. DeBartolo and Mr. Guidry (*See pp.* 47–50 *infra*) were and are one and the same with their wholly-owned corporations is analogous to the "alter ego" doctrine in Louisiana corporate law. Under the "alter ego" doctrine, a court may pierce the corporate veil and impose personal liability on a sole shareholder when it finds that the sole shareholder was in such a position of control and domination as to the corporation that it would be inequitable to recognize the corporation as a separate entity and allow the sole shareholder to escape personal liability. *See generally United States v. Clinical Leasing Serv.*, 982 F.2d 900 (5th Cir.1992); *Equilease Corp. v. M/V Samson*, 568 F.Supp. 1259 (E.D.La.1983) *Pel–Star Energy, Inc. v.*

*United States Dept. of Energy*, 890 F.Supp. 532 (W.D.La.1995).

**101.** *Rosman v. Shapiro*, 653 F.Supp. 1441, 1445 (S.D.N.Y.1987).

**102.** *In re American Airlines, Inc.*, 972 F.2d 605 (5th Cir.1992).

**103.** *In re American Airlines*, 972 F.2d at 614 (citations omitted).

**104.** *In re American Airlines*, 972 F.2d at 616 (emphasis added).

**105.** Rec.Doc. No. 1.

with the riverboat license granted to Mr. DeBartolo's company.

As alleged in the indictment, Stephen Edwards aided and abetted Edwin Edwards in the extortion of $400,000.00 from Mr. DeBartolo and DeBartolo Entertainment in connection with Mr. DeBartolo's application for the fifteenth riverboat license. Mr. DeBartolo's testimony as a witness for the Government in this particular alleged scheme is at the heart of the Government's case insofar as these counts are concerned. Mr. Unglesby, having previously represented Mr. DeBartolo in the application for the fifteenth riverboat license, clearly is faced with an actual conflict.[106] There is no question that the interests of Stephen Edwards are materially adverse to the interests of Mr. Unglesby's former client, Mr. DeBartolo, because it is largely upon the basis of Mr. DeBartolo's testimony that the Government hopes to convict Stephen Edwards on these counts. This is precisely the situation governed by Rules 1.6, 1.7 and 1.9 of the Louisiana Rules of Professional Conduct. These rules establish a clear and actual conflict of interest which prohibits Mr. Unglesby from representing Stephen Edwards in this case. Finding that the Government has satisfied the elements required for disqualification, the Court must now determine whether Mr. DeBartolo ever waived the attorney-client privilege.

### 3. Waiver

 The client is the holder of the privilege; therefore, the power to waive the privilege is the client's alone.[107] The pertinent inquiry here is what constitutes a waiver by the client. In recognizing the attorney-client privilege, the legislative bodies have decided that the detriment to justice from a power to shut off inquiry into pertinent facts is outweighed by the benefits to the system of justice from a franker disclosure in the lawyer's office.[108] Therefore, a waiver must be founded on an affirmative act by the client that creates some further detriment to the truthseeking process in addition to that already taken into account in the creation of the privilege itself.[109]

Under Louisiana law, "the kind of unfairness justifying waiver most commonly results from a privilege-holder's abuse of his privilege" in the following situations: (1) disclosure as set forth in Louisiana Code of Evidence article 502(A); and (2) "placing privileged communications at issue—an affirmative pleading of a claim or defense that inevitably requires the introduction of privileged communications."[110] Since the second situation is not relevant in this case, the Court will focus on disclosure as set forth in Louisiana Code of Evidence article 502(A).

Article 502(A) states in pertinent part that a privilege is waived when the person upon whom the privilege is conferred "voluntarily discloses or consents to disclosure of any significant part of the privileged matter." This language is consistent with federal law governing waiver of the attor-

**106.** During the disqualification hearing, Mr. Unglesby made comments about Mr. DeBartolo's lifestyle and his ability and preference to use private planes to travel as compared to the same ability of other co-defendants. While Mr. Unglesby tried to downplay such comments about Mr. DeBartolo, these are precisely the types of matters which an attorney knows about his client which can be useful during a trial in cross-examining a former client.

**107.** McCormick On Evidence, § 93, at 341 (John William Strong, ed., West Publishing) (1992).

**108.** *See generally McCormick,* § 87, at 313–17 (John William Strong, ed., West Publishing) (1992). *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).

**109.** *Succession of Smith v. Kavanaugh, Pierson & Talley,* 513 So.2d 1138, 1143 (La.1987), *citing* Richard L. Marcus, *The Perils of Privilege: Waiver and the Litigator,* 84 Mich.L.Rev. 1605, 1607 (1986).

**110.** *Succession of Smith,* 513 So.2d at 1143–44 (citations omitted).

ney-client privilege.[111] However, to constitute a waiver, the disclosed communications must be privileged communications. A privileged communication, as defined in Louisiana Code of Evidence article 506(B), is a confidential communication made outside the presence of third parties for the purpose of facilitating the rendition of professional legal services. A confidential communication, however, does not include the facts forming the basis of the communication.

■ "Pre-existing facts that underlie the client's confidential communications, whether oral or written, are not privileged simply because the client disclosed them to an attorney for the purpose of obtaining legal services."[112] It is well-established that the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."[113] Otherwise, a client could conceal a fact merely by revealing it to his attorney. For example, "[t]he client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."[114]

■ Stephen Edwards argues that Mr. DeBartolo waived the attorney-client privilege by: (1) his disclosure of facts during the administrative hearing on his application for a riverboat gaming license; and (2) by the inadvertent disclosure of the five documents by his attorney to the Government. Turning first to the administrative

hearing, the provisions of the Louisiana Gaming Control Law regarding records of the division are relevant. Section 45 reads as follows:

A. All records of the division and of the commission shall be deemed public records and subject to public inspection as provided by the provisions of R.S. 44:1 et seq., **unless the record:**

(1) Relates to the **background of an applicant and was provided by a confidential source or informant.**

(2) Relates to division security.

(3) Consists of an applicant's **initial personal history forms, disclosure forms, and financial statements.**

. . . .

(6) Relates to an ongoing investigation of the division into a violation by a licensee or permittee, until the division initiates proposed enforcement action against the licensee or the permittee.

(7) A **division background investigation of an applicant.**

B. All files, records, reports, and other information pertaining to gaming matters in the possession of the Department of Revenue shall be made available to the division as necessary for the administration of this Chapter and, all files, records, reports, and other information pertaining to gaming matters in the possession of the division shall be made available to the Department of Revenue. **Such records shall be confidential** and not subject to the Public Records Law.

**111.** *Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*, 953 F.2d 1004, 1007 (5th Cir.1992) (under federal law, disclosure of "any significant portion of a confidential communication waives the privilege as to the whole") (citations omitted).

**112.** Weinstein's Federal Evidence, § 503.14[4][a] (McLaughlin ed.2d ed.1998), *citing Upjohn*, 449 U.S. at 395, 101 S.Ct. at 685. *See also United States v. Freeman*, 619 F.2d 1112, 1119 (5th Cir.1980) (witness' testi-

mony that he removed boxes of corporate records was not privileged even though action was recommended by attorney because testimony revealed act in which witness participated, not confidential disclosure).

**113.** *Upjohn*, 449 U.S. at 395, 101 S.Ct. at 685.

**114.** *Upjohn*, 449 U.S. at 396, 101 S.Ct. at 686, quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962).

C. The division may enter into **restricted use and information sharing agreements with gaming regulatory agency and law enforcement agencies.** Information received pursuant to such agreements shall not be disclosed without the permission of the providing agency.[115]

Thus, contrary to the assertion of Stephen Edwards, all information and documentation submitted by an applicant does not automatically become "public record." Certain background information, personal history forms, disclosure forms, financial statements, and the division background investigation of an applicant are not "public records" according to Section 45 of the Louisiana Gaming Control Law. Providing information to the division in an effort to obtain a riverboat license does not constitute a waiver of the attorney-client privilege by the applicant. A public hearing is held at the conclusion of the division's investigation to determine the suitability of the applicant. Documents which are exempt from public disclosure under Section 45 are not required to be made public at the hearing.[116]

Additionally, as previously stated, the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."[117]

There is a presumption that a lawyer receives confidential communications in the course of his representation of a client.[118] The fact that some of the information provided by Mr. DeBartolo may have been made public is immaterial. The attorney-client privilege is not waived merely because a client has to testify. As has been noted elsewhere in this opinion, there is more to the attorney-client privilege. There is no indication in this record that because Mr. DeBartolo had to file a response and submit to an interview conducted by the gaming division, he knowingly and voluntarily waived the attorney-client privilege he had with Mr. Unglesby. If this Court were to follow Mr. Unglesby's argument to the letter, there would be a waiver of the attorney-client privilege each time a witness testifies in a case. The Court does not believe this is a proper rule to adopt under the facts of this case simply to allow Mr. Unglesby to represent Stephen Edwards. The defendant's argument also fails to consider the other duties implicit in an attorney-client relationship—confidentiality and loyalty.

 As for the inadvertent disclosure by someone acting on Mr. DeBartolo's behalf of the five documents as part of a discovery production, the Court finds this inadvertent act does not waive Mr. DeBartolo's attorney-client privilege. This Court cannot adopt a per se rule of waiver under the facts of this case. Instead, the Court must consider the circumstances surrounding the inadvertent disclosure on a case-by-case basis.[119] To resolve this issue, the Court will apply the five-part test adopted by the Fifth Circuit "under which consideration is given to all of the circumstances surrounding the disclosure, including: (1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclo-

---

**115.** La.Rev.Stat.Ann. § 27:45 (Supp.1999) (emphasis added).

**116.** La.Rev.Stat.Ann. §§ 27:45, 27:73 (Supp. 1999).

**117.** *Upjohn,* 449 U.S. at 395, 101 S.Ct. at 685.

**118.** *United States v. Shepard,* 675 F.2d 977, 979–80 (8th Cir.1982); *United States v. Cheshire,* 707 F.Supp. 235, 239 (M.D.La.1989).

**119.** *Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th. Cir.1993). *See also Hebert v. Anderson,* 681 So.2d 29, 31–32 (La.App. 4th Cir.1996) (inadvertent disclosure does not constitute a waiver of the attorney-client privilege).

sure; and (5) the overriding issue of fairness." [120]

It is clear under the facts of this case that as soon as the inadvertent disclosure was discovered, action was taken to secure the remaining documents and to seek the return of the documents erroneously produced. The attorneys representing Mr. DeBartolo immediately raised the attorney-client privilege. The United States has not sought the release of additional documents based on this inadvertent disclosure. Thus, while there may have been an inadvertent disclosure of documents, other considerations outweigh a finding that there had been a waiver of the attorney-client privilege. Here, Mr. DeBartolo immediately asserted the attorney-client privilege upon learning of the disclosure. Furthermore, considerations of fairness weigh in favor of finding that the attorney-client privilege was not waived. While the materials disclosed were clearly privileged and would not have been discoverable absent a waiver, the disclosure of the documents was obviously inadvertent.

 Stephen Edwards also contends that Mr. DeBartolo waived his attorney-client privilege with Mr. Unglesby because he signed and participated in the Joint Defense Agreement. This contention is not supported by the record. The record reveals that Mr. Unglesby discussed his possible conflict of interest with Jack Martzell, who was then representing Mr. DeBartolo. Mr. Unglesby testified during the disqualification hearing that he was told that "there is no problem, keep working. Do not be concerned. There is no conflicts [sic]. If there is any they are waived." [121] At the same hearing, Mr. DeBartolo denied giving Mr. Unglesby any waiver. The following testimony was given by Mr. DeBartolo in response to Mr. Unglesby's testimony:

By Mr. Harwell:

Q. Mr. DeBartolo, You have been in the courtroom throughout the time that this closed hearing has taken place, have you not?

A. That is correct.

Q. And you have heard that which transpired, have you not?

A. I have.

Q. And you have heard Mr. Unglesby make the statement, acting as a witness not as counsel, that as a result of some conversation with Mr. Martzell pertaining to the Corey papers as you called them that he understood that there was a waiver by you in regard to any conflict. You heard that testimony, did you not?

A. I did.

Q. I ask you, Sir, here and now do you waive any attorney-client privileges with regard to this matter?

A. Absolutely not.

Q. Do you waive any conflicts in regard to this matter?

A. No Sir, I don't.

Q. And do you have any recollection, Sir—I am not suggesting you dispute anyone—my question—listen carefully to it.

Do you have any recollection as you sit in the witness chair at this point in time of ever having waived any conflicts or attorney-client privileges regarding Mr. Unglesby?

A. As I sit here I do not recall discussing that or any recollection regarding that. [122]

The inquiry Mr. Unglesby states he made occurred before Mr. DeBartolo decided to plead guilty. For reasons discussed more fully later in this opinion re-

---

**120.** *Alldread,* 988 F.2d at 1433 (five-part test adopted from *Hartford Fire Ins. Co. v. Garvey,* 109 F.R.D. 323, 332 (N.D.Cal.1985)).

**121.** Transcript of February 3, 1999 hearing on Motion to Disqualify, p. 5.

**122.** Transcript of February 3, 1999 hearing on Motion to Disqualify, pp. 9–10.

garding the same issue and Mr. Guidry, the Court finds that Mr. DeBartolo did not waive his attorney-client privilege with Mr. Unglesby because of the Joint Defense Agreement. It is clear there was no interest on the part of Mr. DeBartolo or the other co-defendants to allow information produced under the Joint Defense Agreement to be used against and to the detriment of one co-defendant for the benefit of the other co-defendants.

It is also important to note that the evidence adduced at the hearing reveals that at no time did the Government ask Mr. DeBartolo or Mr. Guidry what each told their attorneys under the Joint Defense Agreement.

Therefore, the Court finds that there is an attorney-client privilege between Mr. DeBartolo and Mr. Unglesby which has not been waived. Indeed, the privilege was affirmatively asserted by Mr. DeBartolo and his attorneys at the disqualification hearing conducted by the Court. The Court further finds that the attorney-client relationship between Mr. Unglesby and Mr. DeBartolo is substantially related to the charges filed against Stephen Edwards.

### C. Issues Concerning Mr. Guidry

#### 1. First Element: Attorney–Client Relationship

██ The Government also contends that an attorney-client relationship existed between Mr. Unglesby and his law firm and Mr. Guidry. As noted earlier Mr. Guidry pled guilty and will testify as a witness for the Government. Mr. Unglesby and Mr. Koch claim that they only served as legal counsel for A–Ace, a corporation for which Mr. Guidry was the sole owner and one-hundred percent shareholder. Thus, the nature and scope of Mr.

Unglesby's and Mr. Koch's representation of A–Ace must be closely examined.

On December 16, 1993, Lieutenant Riley Blackwelder of the Louisiana State Police, Video Gaming Division, sent a letter to Mr. Guidry informing him of immediate suspension and revocation of A–Ace's video poker operator's license. One basis for the suspension and revocation was Mr. Guidry's lack of "suitability" because of his alleged business relationship with Frank Caracci, "a known associate of organized crime (La Costra Nostra)...."[123] Other reasons for suspension and revocation were also cited by the division.

As a result of the aforementioned action by the State Police, on December 17, 1993, a Petition for Injunctive Relief was filed in the Nineteenth Judicial District Court for the Parish of East Baton Rouge by the Unglesby law firm on behalf of A–Ace.[124] In the state court petition, A–Ace specifically denied the allegation of lack of suitability to operate its business. Thereafter, on January 6, 1994, the Unglesby law firm filed a Petition for Declaratory Judgment and Injunction in the same court on behalf of A–Ace.[125] Essentially, A–Ace claimed that the video poker regulations were invalid and that the procedures utilized by the State Police denied A–Ace the right to due process. The subsequent suitability hearing conducted by the State Police was done pursuant to procedures approved of and adopted by the state district court based on the suit filed by the Unglesby law firm.

██ It is clear that the sole issue at the hearings requested by the State Police was the suitability of Mr. Guidry. As noted earlier, Mr. Guidry was the sole shareholder of A–Ace. It was Mr. Guidry's business associations and suitability which were at issue during the hearings. It is

---

123. *Disqualification Hearing, Government's* Exhibit # 1.

124. *Disqualification Hearing, Government's* Exhibit # 8.

125. *As represented in this subsequent petition, the initial petition was dismissed upon the agreement of the State Police to leave the video machines in operation pending the hearing as authorized by law.*

also important to note that had Mr. Guidry not been deemed suitable to operate a video poker business, he would also have not been suitable to obtain a riverboat gaming license.[126] Thus, this suitability hearing regarding Mr. Guidry's ability to engage in video poker operations had added significance to Mr. Guidry. While Mr. Unglesby downplayed his role and his law firm's role as attorneys for Mr. Guidry during these proceedings, the record is to the contrary. The mere fact that an attorney does not work on every facet of the case does not mean there is no attorney-client relationship. The Court cannot overlook the 29 entries on the time sheets of James G. Perdigao, an attorney with the Adams and Reese law firm who also represented Mr. Guidry in the suitability hearings, which reflect his discussions with Mr. Unglesby and Mr. Koch about issues related to the suitability hearings. Moreover, Mr. Perdigao testified at the disqualification hearing that the law firm of Unglesby and Koch served as co-counsel with Adams and Reese during both the administrative and judicial hearings, despite the fact that neither Mr. Unglesby nor Mr. Koch actually appeared at the administrative hearings. Under the particular circumstances and facts of this case, to say that Mr. Unglesby and his law firm had an attorney-client relationship with only A–Ace and not with Mr. Guidry would again be "exalt[ing] form over substance." [127] The nature and extent of Mr. Unglesby's and Mr. Koch's representation is dispositive under these circumstances. Mr. Guidry's expectation that there existed an attorney-client relationship with Mr. Unglesby and his law firm was reasonable under the facts of this case. Based on the evidence presented to this Court, the Court finds that Mr. Un-

glesby and his law firm represented Mr. Guidry in his individual capacity.

## 2. Second Element: Substantial Relationship

 It is also clear to this Court that Mr. Unglesby and his law firm represented Mr. Guidry on matters related to the indictment in this case. This representation was not just limited to the temporary restraining order mentioned above, but continued thereafter.[128] As stated earlier, this Court cannot overlook the 29 entries which refer to Mr. Unglesby, Mr. Koch, or their law firm on the time sheets of Mr. Perdigao who also represented Mr. Guidry in the suitability hearings. It is also clear that proving suitability is a requisite for licensing for both video poker operations and riverboat gaming operations.[129] The Court must also consider the fact that the riverboat license granted to Mr. Guidry after he satisfied the suitability requirements to hold a video poker license is an important part of the indictment brought against Stephen Edwards. Specifically, it is alleged in the indictment that Stephen Edwards and others extorted monthly payments of approximately $100,000.00 from Mr. Guidry in connection with securing a riverboat license to operate the Treasure Chest Casino.[130] Clearly, the prior representation of Mr. Guidry by Mr. Unglesby and his law firm is substantially related to the present case.

Mr. Unglesby stated at the hearing conducted by this Court that he will not cross-examine Mr. Guidry during the trial of this case. This does not control the decision the Court must make. It is clear that Mr. Guidry will be called as an important government witness in this case against Ste-

126. La.Rev.Stat.Ann. § 27:70 (Supp.1999).

127. *Rosman v. Shapiro*, 653 F.Supp. 1441, 1445 (S.D.N.Y.1987) *See also* footnote 100 *supra*.

128. The testimony of Mr. Perdigao at the disqualification hearing corroborates this finding.

129. La.Rev.Stat.Ann. §§ 27:73, 27:310 (Supp. 1999).

130. Rec.Doc. No. 1.

phen Edwards and the other defendants. No offer was made by Mr. Unglesby to refrain from referring to or attacking Mr. Guidry during the opening statements and closing arguments. The dangers the Court sees in Mr. Unglesby representing one defendant and attempting to impeach his former client are self-evident. As in the case of Mr. DeBartolo, Mr. Guidry deserves the same loyalty and confidentiality from Mr. Unglesby as Mr. Unglesby wants to give to Stephen Edwards. Such a conflict is an actual conflict and must be dealt with by the Court as such. Finding that the Government has satisfied the elements required for disqualification, the Court must now determine whether Mr. Guidry waived the attorney-client privilege.

### 3. Waiver

Stephen Edwards contends that Mr. Guidry waived the attorney-client privilege as to the law firm of Unglesby and Koch when Mr. Guidry signed the release of information agreement associated with the gaming application and the Joint Defense Agreement. The Court will first discuss the release-of-information document. On April 16, 1992, as a part of the application process, Mr. Guidry, on behalf of A–Ace, signed a request to release information, which provides as follows:

> 1. I hereby authorize and request all persons to whom this request is presented having information relating to or concerning me to furnish such information to a duly appointed agent of the Louisiana State Police, Video Gaming Division, whether or not such information would otherwise be protected from disclosure by any constitutional, statutory, or common law privilege.
>
> 2. I hereby authorize and request all persons to whom this request is present-

ed having documents relating to or concerning me to permit a duly appointed agent of the Louisiana State Police, Video Gaming Division, to review and copy any such documents, whether or not such documents would otherwise be protected from disclosure by any constitutional, statutory, or common law privilege.[131]

There is no need to repeat here what was said in regard to the same issue involving Mr. DeBartolo. This agreement to release information was not a release of the attorney-client privilege by Mr. Guidry.[132]

Mr. Unglesby and Mr. Koch also argue that Mr. Guidry waived any attorney-client privilege via his participation in the Joint Defense Agreement.[133] The pertinent portion of the agreement, signed by Mr. Guidry on July 23, 1997 prior to his pleading guilty, provides as follows:

> 3. Undersigned counsel have agreed to exchange "defense materials" between them in order to further their clients' common interests. It is their mutual understanding that such exchanges or disclosures are not intended to and will not diminish in any way the confidentiality of such materials or operate as a waiver of any applicable privilege. For purposes of this Agreement, the term "Confidential Materials" shall include all information exchanged between or among the Parties, including all written and oral communications. All "Confidential Materials" exchanged between the Parties in connection with the joint defense effort, and all information, documents, or materials derived from "Confidential Materials" shall be subject to the terms of this Agreement.
>
> . . . .

**131.** Disqualification Hearing, Stephen Edwards' Exhibit # 6.

**132.** The information released by Mr. Guidry remained confidential. *See* La.Rev.Stat.Ann. § 27:21 (Supp.1999).

**133.** Disqualification Hearing, Government's Exhibit # 9 (filed under seal).

10. Access to or possession of communications or information that has been transferred among any of the undersigned counsels' law firms or clients shall not be a basis for disqualification of any law firm in any matter in future investigations or civil or criminal cases or in any other matter for which the law firm was retained prior to the service of the grand jury subpoenas. The parties to this agreement take no position as to whether counsel would be disqualified in other cases.[134]

The Court does not believe the Joint Defense Agreement, when read as a whole, constitutes a waiver of the attorney-client privilege Mr. Guidry has with Mr. Unglesby and Mr. Koch and their law firm.[135] Furthermore, it is clear that there was no intent on the part of Mr. Guidry and his co-defendants to allow the information exchanged as part of the Joint Defense Agreement to be used against and to the detriment of one co-defendant for the benefit of another co-defendant. Such is the situation that Mr. Guidry, who has not yet been sentenced, now finds himself in as a former client whose credibility can be challenged by his former attorney during cross-examination or opening statements and closing arguments. The Court received a possible preview of what could happen at the trial when Mr. Unglesby stated to the Court during the disqualification hearing that Mr. Guidry lied at the time Mr. Guidry entered his guilty plea before Judge Parker.[136]

Finally, the Court must note that Mr. Unglesby sent an affidavit to Mr. Guidry and his attorneys after Mr. Guidry had entered his guilty plea seeking to have Mr. Guidry waive the attorney-client privilege with Mr. Unglesby. On the advice of his new counsel, Mr. Guidry refused to sign the waiver.

In summary, the Court finds that there was an attorney-client relationship between Mr. Guidry, individually, and Mr. Unglesby and his law firm. The Court further finds that Mr. Guidry and his current attorneys did not waive the attorney-client privilege he has with the Unglesby law firm. Finally, the Court concludes that this attorney-client relationship between the Unglesby law firm and Mr. Guidry is substantially related to the charges filed against Stephen Edwards.

## V. Remedies—Conflict of Interest

Having found that Mr. Unglesby and the law firm of Unglesby and Koch did represent Mr. Guidry and Mr. DeBartolo, the Court must now determine if the actual conflict of interest may be waived by Stephen Edwards if the Court imposes trial restrictions or limitations on Mr. Unglesby and his law firm due to the attorney-client privilege Mr. Unglesby and his law firm has with Mr. Guidry and Mr. DeBartolo.

When ruling on the motion to disqualify, the Court "must make a careful inquiry, balancing the constitutional right of the defendant to representation by counsel of his choice with the court's interest in the integrity of the proceedings and the public's interest in the proper administration of justice." [137]

As noted earlier in this opinion, the right to counsel secured under the Sixth Amend-

134. Disqualification Hearing, Government's Exhibit # 9 (filed under seal).

135. As noted earlier, the Court's discussion of how the Joint Defense Agreement affects Mr. Guidry also applies to Mr. DeBartolo.

136. Accusing a client of lying to the court could have a direct impact on the sentence which the court must impose under the United States Sentencing Commission Guidelines. Thus, if the court finds that a defendant lied to the court, the judge could find he was guilty of obstruction of justice under U.S.S.G. § 3C1.1. This would add two points to the defendant's offense level. Such a finding could also require that the court not give the defendant a reduction of offense level points or acceptance of responsibility under U.S.S.G. § 3E1.1.

137. *United States v. Mays*, 69 F.3d 116, 121 (6th Cir.1995).

ment includes the right to counsel of choice as one element of this basic guarantee.[138] Although the right to counsel of choice is an element of this basic guarantee, the Court must bear in mind that the essential aim of the amendment is to guarantee an effective advocate for a criminal defendant. It is not to "ensure that a defendant will inexorably be represented by the lawyer whom he prefers."[139] Thus, the right to counsel of choice is neither absolute nor unqualified.[140]

"[W]here 'considerations of judicial administration' supervene, the presumption in favor of counsel of choice is rebutted and the right must give way."[141] "[T]he potential for serious conflicts is a consideration of judicial administration that can outweigh a defendant's right to counsel of choice."[142] The Court must, therefore, balance all interests in resolving the issue of disqualification.

The seminal case on attorney disqualification is *Wheat v. United States.*[143] In *Wheat,* the Supreme Court held that the Court must engage in a balancing of all competing factors. Specifically, district courts "must recognize a presumption in favor of [a criminal defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court."[144] In *Wheat,* as in this case, the **"question raised ... is the extent to**

**which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy."** [145]

## A. Analysis

 When an issue of conflict of interest arises, the Court must first determine whether an actual or potential conflict exists. If such a conflict exists, the Court must ensure that the conflict is either eliminated or waived.[146] If the conflict cannot be eliminated or waived, the attorney must be disqualified.

### i. Inquiry Obligation

 When a court "learns of even the possibility of a conflict of interest, it must inquire into the details of the attorney's interests to determine whether the conflict is actual, potential, or nonexistent."[147] In response to this mandate, this Court conducted an extensive hearing on the Government's motion to disqualify and gave Stephen Edwards and his attorneys ample opportunity to present evidence on all of the issues involved.

As explained earlier in this opinion, the Court finds that there was an actual conflict in this case stemming from Mr. Unglesby and his law firm's representation of Mr. DeBartolo and Mr. Guidry. At the very least, there are serious potential conflicts under the facts of this case. The Court must now determine whether the actual or potential conflicts can be resolved

138. *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932).

139. *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

140. *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697.

141. *United States v. Voigt,* 89 F.3d 1050, 1074 (3d Cir.1996) (citations omitted).

142. *Voigt,* 89 F.3d at 1075.

143 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

144. *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697 (citations omitted).

145. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700 (emphasis added).

146. *United States v. Lussier,* 71 F.3d 456, 461 (2d Cir.1995) (citations omitted).

147. *Lussier,* 71 F.3d at 461 (citations omitted).

by a waiver, or whether Mr. Unglesby and his law firm must be disqualified from representing Stephen Edwards.

### ii. Waiver or Disqualification

In deciding whether to accept a waiver or order disqualification, the Court must again turn to the following instructions and caution set forth by the Supreme Court in *Wheat:*

> Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented. As the Court of Appeals for the Third Circuit stated in *United States v. Dolan:*

> > "[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver." [148]

In cases where there is a potential for a conflict, the Supreme Court noted:

> For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not bur-geon into an actual conflict as the trial progresses. [149]

 In short, the "District Court must recognize a presumption in favor of [a criminal defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." [150]

Stephen Edwards has expressed to this Court his strong desire to have Mr. Unglesby and his law firm represent him in these proceedings. This Court accepts Stephen Edwards' evaluation of Mr. Unglesby as a very competent attorney in this type of case. The Court also believes that Mr. Unglesby and his law firm are very sincere in their desire to continue representing Stephen Edwards in this case without violating a former client's loyalties and confidences or an ethical rule of the profession. In his attempt to remain in the case, Mr. Unglesby states he will not cross-examine Mr. Guidry or Mr. DeBartolo. He will, however, participate in opening statements and closing arguments to the jury.

Mr. DeBartolo and Mr. Guidry both expressed concern in their testimony that Mr. Unglesby was going to represent Stephen Edwards at the trial. Each also asserted the attorney-client privilege he has with Mr. Unglesby and his law firm, and neither consents to Mr. Unglesby or his law firm's representation of Stephen Edwards. Mr. DeBartolo and Mr. Guidry both deserve the same loyalty and confidentiality from Mr. Unglesby and his law firm as they want to give to Stephen Edwards.

 In light of the facts of this case and Rules 1.6, 1.7, and 1.9 of the Louisiana

---

148. *Wheat,* 486 U.S. at 162, 108 S.Ct. at 1698–99, *citing United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978).

149. *Wheat,* 486 U.S. at 163, 108 S.Ct. at 1699.

150. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700.

Rules of Professional Conduct, the Court finds an actual conflict exists in this case. Mr. Unglesby and his law firm's former clients were co-defendants with Stephen Edwards. Two of the charges to which Mr. DeBartolo and Mr. Guidry have pled guilty are directly related to the charges set forth in the indictment. The Government intends to use the testimony of Mr. Guidry and Mr. DeBartolo in its attempt to convict Stephen Edwards. The charges brought against Stephen Edwards include conspiracy charges and violations of Title 18, United States Code Section 2, the aiding and abetting statute. Just as in *Wheat,* Mr. Unglesby and Mr. Koch have represented two former members of the alleged conspiracy who have pled guilty and will testify for the Government. Mr. Unglesby's proposed solution of not cross-examining Mr. DeBartolo and Mr. Guidry does not eliminate the conflict.[151] This Court agrees with Judge John Parker's pronunciation in *United States v. Cheshire* wherein he stated: "this judge views it as an almost impossible task for a lawyer to participate throughout the course of a trial but not suggest a single question or style for cross examination of the most important witness against his present client ." [152] Indeed, this very thing occurred at the disqualification hearing. Although another attorney was retained to cross-examine Mr. DeBartolo and Mr. Guidry, Mr. Unglesby and Mr. Koch passed notes and made oral suggestions to the attorney conducting the cross-examination. The Court has no reason to doubt this practice would continue to occur during trial preparation and during the trial itself when Mr. DeBartolo and Mr. Guidry testify. As stated earlier, this is an actual conflict and causes grave damage to the sanctity of the attorney-client privilege and to the proper representation which all of Mr. Unglesby and Mr. Koch's clients are entitled to receive from them.

Stephen Edwards questions the Government's motive in filing the motion to disqualify Mr. Unglesby and his law firm. Stephen Edwards contends the Government is trying to obtain a tactical advantage because the Government knows of Mr. Unglesby's professional abilities and knowledge of important issues in this case. The Court must note that the skepticism expressed by Stephen Edwards is not supported by the facts of this case. The Court does not believe the Government is trying to disqualify Mr. Unglesby and his law firm because they are good lawyers. The Court accepts the Government's declaration of good faith in filing the motion to disqualify. Indeed, the record reflects that while the Government also filed a motion to disqualify Michael Fawer, who serves as counsel for Edwin Edwards, and while the Court on its own motion conducted a hearing on whether Hillar Moore could represent Gregory Tarver, the Government did not object to these attorneys remaining in the case after the Court conducted a thorough hearing on the issues and accepted waivers from Edwin Edwards and Gregory Tarver. The Court must note, however, that the facts of the motions involving Mr. Tarver and Edwin Edwards were substantially different from those involving Stephen Edwards because either the former clients will not be called as witnesses, the former clients waived the attorney-client privilege, or no attorney-client privilege existed. This is vastly different from the facts involving Stephen Edwards because Mr. Unglesby and Mr. Koch's two former clients are co-defendants who have pled guilty, will be key

---

**151.** For example, it is difficult for the Court to describe the tempo of the cross-examination conducted by Karl Koch of Mr. Perdigao during the hearing of the disqualification motion. Mr. Perdigao, who was co-counsel for Mr. Guidry during the suitability hearing, had to withstand numerous questions from Mr. Koch who was attempting to show there was no attorney-client relationship with Mr. Guidry, while Mr. Perdigao was trying to defend the attorney-client relationship he and the Unglesby law firm had with Guidry.

**152.** *United States v. Cheshire,* 707 F.Supp. 235, 240 (M.D.La.1989).

government witnesses at the trial, were represented by the Unglesby law firm in substantially related matters, and have not waived their attorney-client privilege with Mr. Unglesby and his law firm.

A review of the facts in this case leads this Court to one conclusion: Mr. Unglesby and his law firm must be disqualified from representing Stephen Edwards. The actual conflict and the serious potential conflicts prevent the Court from accepting any waiver which may be given by Stephen Edwards and any limitations on trial participation to which Stephen Edwards and his attorney may consent. The Court concurs with the concern expressed by the Supreme Court in *Wheat* when it stated:

> Trial courts confronted with multiple representations face the prospect of being "whip-sawed" by assertions of error no matter which way they rule. If a district court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. On the other hand, a district court's refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case.[153]

This Court honestly believes that Stephen Edwards' Sixth Amendment rights to proper, conflict-free representation would be violated and jeopardized if Mr. Unglesby and his law firm were allowed to remain in the case. The Court further believes that any action short of disqualifying Mr. Unglesby and his law firm would deprecate and lessen the sanctity of the attorney-client privilege. Disqualification is necessary to protect both the attorney-client privilege and Stephen Edwards'

Sixth Amendment right to counsel, and to guarantee that the trial will be conducted in a fair and impartial manner in accordance with proper ethical standards. To wait until the trial to learn that Stephen Edwards needs his own attorney to conduct a vigorous cross-examination of Mr. Guidry and Mr. DeBartolo is not in the interest of fairness, justice or judicial economy. Yet to learn that such a vigorous cross-examination is required would create an ethical dilemma for Mr. Unglesby and his law firm from which one of their clients will likely suffer. One of the clients to suffer could be Stephen Edwards who could then complain he was deprived of his right to effective assistance of counsel if he was convicted.

If a conflict is not severe or there is only the possibility of a conflict, the Court may consider a waiver of the conflict. However, if a conflict is so egregious, as it is in this case, that no rational defendant would knowingly and voluntarily desire the attorney's representation, then the Court must disqualify the attorney.[154] In this case, Stephen Edwards' attorneys' prior representation of government witnesses also results in the potential for divided loyalties.[155] The Court finds that the potential for divided loyalties is serious enough to justify disqualification of Mr. Unglesby and his law firm. The Court also believes the conflict is so severe as to render the trial "inherently unfair," undermining the integrity of the judicial system and depriving Stephen Edwards of his right to the effective assistance of counsel.[156]

Even if Stephen Edwards chose to waive the conflict, the Court is empowered to reject the waiver.[157] As explained in *Wheat,* the Court has "substantial latitude in refusing waivers of conflicts of interest

---

**153.** *Wheat,* 486 U.S. at 161, 108 S.Ct. at 1698 (citation omitted).

**154.** *United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994).

**155.** *United States v. Millsaps,* 157 F.3d 989 (5th Cir.1998) (upholding district court's ruling of disqualification of attorney because at-

torney previously represented a government witness in the case creating a potential for divided loyalties).

**156.** *United States v. Vaquero,* 997 F.2d 78, 90 (5th Cir.1993).

**157.** *Wheat,* 486 U.S. at 162–63, 108 S.Ct at 1698–99.

not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."[158] Thus, a defendant's right to waive conflict-free counsel is not absolute.

After balancing the constitutional right of the defendant Stephen Edwards to representation by counsel of his choice with the Court's interest in the integrity of these proceedings and the public's interest in the proper administration of justice, the Court finds that the actual and potential conflicts are serious and pervasive enough to justify the disqualification of Mr. Unglesby and his law firm. The Court's decision to disqualify Mr. Unglesby and his law firm encompasses all members of his firm, including Karl Koch.

Therefore:

IT IS ORDERED that Lewis Unglesby and the law firms of Unglesby and Koch and Unglesby, Koch and Reynolds are disqualified from representing Stephen Edwards in this case.

---

**158.** *Wheat,* 486 U.S. at 164, 108 S.Ct at 1699.